[No. 3528.  Decided November 7, 1900.]

DORA MAY DORMITZER *et al., Appellants, v.* THE GERMAN SAVINGS AND LOAN SOCIETY, *Respondent.*

RIGHTS AND REMEDIES—EQUITABLE ACTIONS—RELIEF ADJUSTED TO FACTS SHOWN.

Where a complaint in equity states facts warranting the restoring and foreclosure of mortgages which had been wrongfully canceled, and also facts showing that a guardian's sale and conveyance of the same property upon which the mortgages had been given were fraudulent, and prays for a foreclosure of the mortgages and for relief generally, the plaintiffs are not restricted to the relief asked for specially, but may be granted such relief as the facts show they are entitled to; and hence cannot be said to have waived the fraud charged in the guardianship sales, nor to have definitely adopted the remedy of the foreclosure of the mortgages, to the exclusion of any other remedy that may be warranted by the allegations of the complaint.

GUARDIANSHIP SALES—IRREGULARITIES—CURATIVE ACT.

Bal. Code, § 6474, which is intended as a curative act for all irregularities in guardianship sales, when the premises are held by one who purchased them in good faith, does not apply to cases where the guardianship proceedings are assailed on the ground of fraud from their very inception, and where the purchaser is shown to have had knowledge of facts which should have put him on inquiry.

JUDGMENTS OF SISTER STATE—JURISDICTION OF COURT—JUDICIAL NOTICE.

When the records and judicial proceedings of the courts of another state are sought to be given effect in this state, the courts of this state will take judicial notice of the laws conferring jurisdiction on the courts from which such records come, in pursuance of the provision of the constitution of the United States which requires that "full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state."

SAME—COLLATERAL ATTACK.

The provision of the United States constitution requiring full faith and credit to be given in each state to the judicial proceedings of every other state does not prevent a collateral attack upon the jurisdiction of the court of a sister state to render the judgment offered in evidence in an action brought in another state.

FOREIGN DIVORCE—JURISDICTION—DOMICILE OF PARTIES.

A decree of divorce rendered by a court of another state may be collaterally questioned and declared void in an action in this state in which effect is sought to be given to it, when it appears that, prior to the institution of the suit for divorce, the court rendering the decree had lost jurisdiction of the subject matter, through the abandonment by the husband and wife of their residence in that state; that the defendant had never been properly served with summons in accordance with the laws of that state; that she was ignorant of the suit; that an appearance entered for her and answer in her behalf by an attorney were without her knowledge or authorization; that the decree was rendered a month prior to the time she was required by the summons to appear and answer; that, immediately upon learning of the decree she instituted an action against her husband in this state to have the divorce declared fraudulent and herself awarded a half interest in the property held by

her husband; and that, within two days thereafter, the parties were remarried on a compromise whereby it was agreed the latter suit should be dismissed, the parties should remarry ana should share the property in dispute as community property.

### SAME—EVIDENCE—DECLARATIONS AS RES GESTAE.

In an action in which the validity of a decree of divorce obtained by the husband against the wife is in issue, the record containing complaint, summons and stipulation for dismissal, in an action by the wife attacking the divorce on the ground of fraud, instituted by her immediately after learning that a decree of divorce had been granted against her on the ground of adultery and showing that the husband agreed to remarry her immediately upon dismissal of the action, are admissible as circumstances tending to prove the fraudulent character of the decree, since, though mere declarations, they were in the nature of *res gestae*, and were contemporaneous with the main fact under consideration and illustrative of its character.

### LAWS OF SISTER STATE—PRESUMPTIONS.

The laws of another state in relation to the property rights of husband and wife, as to property acquired there during marriage, will be presumed, in the absence of proof, to be the same as those of this state, when the proceeds of such property have been re-invested here.

### COMMUNITY PROPERTY—PRESUMPTIONS ARISING FROM PURCHASE DURING COVERTURE.

Under the laws of this state, lands acquired after marriage by a deed of purchase expressing a money consideration are presumed to be community property; and this presumption can be rebutted only by clear and convincing proof that the consideration was furnished out of the grantee's separate property.

### MORTGAGE—GOOD FAITH OF MORTGAGEE—FRAUDULENT SALE BY GUARDIAN TO MORTGAGOR.

A corporation which takes a mortgage upon property is not a purchaser in good faith, when the agents through whom it acts in negotiating the loan know, or have means of information through which they might, by the exercise of common prudence, have known, that the acts of a guardian of minor children in transferring the property to the mortgagor were fraudulent.

SAME—FRAUDULENT PROBATE PROCEEDINGS—NOTICE.

Although a mortgagee may have had no actual knowledge of the invalidity of the mortgagor's title, it cannot set up the defense that it was a purchaser in good faith when the chain of title to its grantor shows a guardian's deed to him, which makes reference to certain probate proceedings as authority for the deed, and an investigation of those proceedings would have shown them to be fraudulent.

GUARDIAN AND WARD—SALE OF PROPERTY BY GUARDIAN—WHEN VOID.

A transfer of the half interest of minor children in certain realty to their father, procured at his instance through a guardian controlled by himself, and made for the purpose of vesting the whole title unincumbered in the father, so that he might procure a mortgage loan thereon, the law not permitting the mortgage of the property of minors by their guardian, was absolutely void, although the father, the guardian, the mortgagee and the probate court may have acted with the best of motives, and with no intent to defraud such minor children.

ESTOPPEL—INCONSISTENT CLAIMS ON DIFFERENT OCCASIONS.

Where a husband and wife had agreed that the realty held in his name was community property, and such status had been recognized by a mortgagee from whom a loan thereon was sought, and who refused to make such loan after the death of the wife, until the interest of the children should have been transferred to the father, the mortgagee is estopped from afterwards disputing the title of the children by claiming that the realty had always been the separate property of their father.

Appeal from Superior Court, Spokane County.—Hon. WILLIAM E. RICHARDSON, Judge. Reversed.

*Nash & Nash* and *William M. Murray,* for appellants.

*Happy & Hindman* and *Struve, Allen, Hughes & Mc-Micken,* for respondent.

The opinion of the court was delivered by

WHITE, J.—The issues tried in the court below are set forth in the respondent's brief, which, for convenience,

we accept as a substantial statement of the same, and were as follows: The plaintiffs, Dora May Dormitzer and William L. Tull, filed their complaint in the action on the ——— day of April, 1897, making the respondent, the German Savings & Loan Society, together with F. M. Tull, P. D. Tull, individually, and as guardian of Ernest B. Tull, and Ernest B. Tull, a minor, and others, defendants. The complaint sets out two causes of action. The first cause, omitting the formal part, alleges that the plaintiffs and the minor defendant, Ernest B. Tull, are the children of F. M. Tull. That on the 3d day of July, 1888, the defendant P. D. Tull petitioned the probate court of Spokane county to be appointed guardian of the person and estate of the said minor children, and that on the 24th day of that month said P. D. Tull was appointed their guardian, and he thereupon assumed, and has ever since assumed, to exercise the duties of guardian for them, and that at the time of his appointment as such guardian Dora May was ten years of age, William L. fourteen, and Ernest B. five years of age, and all of them resided with their father, and that P. D. Tull is a brother of F. M. Tull. That on the 1st day of March, 1889, said F. M. Tull made, executed and delivered to P. D. Tull, as said guardian, his promissory note for the sum of $14,000, due five years after date, with interest at 10 per cent. per annum, and secured the same by a mortgage to said guardian of even date therewith, upon the property described in said cause of action, which mortgage was filed for record on the 8th day of March, 1889. That on the 7th day of September, 1889, the said guardian released and satisfied said mortgage, which release was filed for record on the 11th day of September, 1889. That the release of the said mortgage by said guardian was executed without any order or judgment of the court authorizing him to execute the same, and without bringing the same to the attention

or knowledge of the probate court, and was made without the payment of the debt secured thereby, and that the same is undischarged and unsatisfied. That said release and satisfaction was made in pursuance of a conspiracy made and entered into by the defendants, F. M. Tull, P. D. Tull and the German Savings & Loan Society, some time in the year 1888, with the fraudulent intent, among others, to cheat and defraud these plaintiffs and their brother. That on the 18th day of July, 1888, the plaintiffs and defendant, Ernest B. Tull, were the owners and seized in fee simple of the property described in said mortgage. That P. D. Tull and F. M. Tull then and there conspired together, for the purpose of cheating the plaintiffs and their brother Ernest B. Tull out of the said real estate, procuring the appointment of the said P. D. Tull as guardian, and by the filing of a petition in the probate court of Spokane county, falsely alleging that it would be beneficial to the plaintiffs and their brother to sell the interest in real estate above mentioned. That in pursuance of the said petition, and influenced thereby, and acting upon the same, said probate court ordered and decreed that the guardian sell said property for cash, to the highest bidder at public sale, which order was made on the 3d of September, 1888, and pursuant to said order said guardian did sell said real estate on the 26th day of November, 1888, to F. M. Tull, and reported said sale to the court, which report was approved by the court on the 27th day of November, 1888.

That P. D. Tull, as guardian, made, executed, and delivered to F. M. Tull a guardian's deed, purporting to convey thereby to F. M. Tull all the right, title, and interest of the said plaintiffs and their brother in and to said real estate, which deed was filed in the auditor's office on the 30th day of November, 1888, and recorded December 1, 1888. That said sale was not for cash, or for any con-

sideration passing at that time, or at the time said deed
was executed; that all the proceedings taken in said case
and proceedings relative to the sale of said property were
brought about by the defendants F. M. Tull and P. D.
Tull, for the purposes and object, among others, of se-
curing to F. M. Tull the whole estate and undivided title
and interest in and to the real estate, and for the purpose
of cheating and defrauding plaintiffs and defendant Er-
nest B. Tull. That the purchase price of $14,000, the
purported consideration for said real estate, was grossly
inadequate, and that at the date of the said transaction
the interest of the plaintiffs and their brother was worth
$35,000 and upwards. That twenty days after said
guardian's deed was filed, said F. M. Tull mortgaged said
real estate to the German Savings & Loan Society, to se-
cure F. M. Tull's promissory note of $40,000, which mort-
gage was executed by F. M. Tull on the 6th day of De-
cember, 1888, and filed in the auditor's office on the 21st
day of January, 1889. That the said mortgage had been
negotiated and its terms and conditions had been agreed
and determined upon, by the parties previous to the said
guardian's proceedings. That previous to the 1st day of
August, 1888, the date when P. D. Tull, as guardian, filed
his petition to sell said real estate, the German Savings &
Loan Society knew the condition of the said property, and
all about the title to the same; and that the guardianship
proceedings aforesaid were arranged, conceived, and all
such details were settled and agreed upon, by F. M. and
P. D. Tull and their attorneys, and the German Savings
& Loan Society and its attorneys, and that the attorneys
of these several defendants jointly drew up and indited
the various petitions and orders drawn up and presented
in said case No. 219. That the German Savings & Loan
Society, at the time of the execution of the guardian's
deed, and in all the proceedings leading up thereto, knew

that plaintiffs' and their brother's interest in said property was worth the sum of $35,000 and upwards, and that the decree authorizing said sale was a subterfuge arranged by F. M. Tull for his own benefit and advantage. That, when said guardian's sale was reported to have been made for cash, the German Savings & Loan Society knew that said report was false, and that said sale was not for cash or anything of value and that said report was made by said guardian, was false and fraudulent, and, as a part of the fraudulent purpose of F. M. Tull, said order of sale and guardian's deed were procured in order to allow F. M. Tull to mortgage said real estate, for his own benefit and advantage, to the German Savings & Loan Society for $40,000. That on the 7th day of March, 1889, the guardian P. D. Tull reported to the probate court that he had invested the proceeds of said sale in the notes of F. M. Tull, dated March 1, 1889, and secured by a mortgage on real estate, which is the same note and mortgage heretofore mentioned. That the said report of the guardian committed a fraud upon said court and plaintiffs, and that he did not state in said report whether the said mortgage was a first or second mortgage on said real estate, when in truth and in fact said mortgage was a second mortgage on said real estate, to-wit: second to the mortgage of $40,000 held by the German Savings & Loan Society, and said society knew that the said guardian had perpetrated said fraud upon the court and plaintiffs. That on the 5th day of November, 1889, the said German Savings & Loan Society released said $40,000, and said release was filed on the 11th day of November, 1889. That on the 26th day of October, 1889, F. M. Tull gave to the German Savings & Loan Society a mortgage on said property to secure his promissory note for $50,000, which was recorded on the 25th day of November, 1889. That on the 13th day of May, 1892, said $50,000 was duly and

regularly released by a release deed, filed May 20, 1892. That on the 6th day of May, 1892, F. M. Tull mortgaged the real estate above described, and other real estate, to the German Savings & Loan Society, to secure F. M. Tull's note for $100,000, which mortgage was recorded in the auditor's office of Spokane county; which mortgage was thereafter foreclosed by the German Savings & Loan Society, and, under and by virtue of a deed executed in pursuance of said foreclosure proceeding, said German Savings & Loan Society claimed to be the owner of the said real estate. That said guardian made no reports or entered any account as such guardian after December 10, 1889. That in the guardian's petition in case No. 219, filed August 1, 1888, the defendant P. D. Tull, as guardian, described and mentioned said real property of the plaintiffs and their brother, and alleged that said property was mortgaged for $20,000, which was false. That there was no mortgage on said property, and the German Savings & Loan Society knew that fact. That the said property mentioned, and the real estate described herein, was fraudulently sold and disposed of to the German Savings & Loan Society, and which sale is made the second cause of action as against the defendants joined herein. That when the order of sale was made on December 10, 1889, disposing of said last mentioned property, no proceeding was thereafter taken in said case by said guardian; that he is now and always has been in default, and never has pretended to report to the court regarding said real estate, or in any way reported his acts as guardian, except to make and file in said case such records and papers as would effectually dispose of said wards' property. That on the 20th day of February, 1894, Dora May Tull was legally and lawfully married to Paul C. Dormitzer. That at the time of the sale of the said real estate to said F. M. Tull by said guardian, no appraisers were appointed to

appraise the same; no guardian *ad litem* was appointed
to protect the interests of the said plaintiffs and their
brother, and there was no bidder at said sale except F.
M. Tull, and the German Savings & Loan Society knew
all of the said facts. That the bond executed by said
guardian for the faithful execution of his trust is invalid
and void, not being such a bond as is required of guar-
dians; that the sureties are insolvent; P. D. Tull is unable
to respond in damages to the amount of said notes and
interest; that the bond required by statute of the guardian,
when making the sale of their wards' said real estate, and
filed herein by P. D. Tull, was canceled and discharged
by the court immediately after the sale of the said prop-
erty, and that the sureties thereon are insolvent. That the
defendant, Ernest B. Tull, is a minor of the age of six-
teen years, residing with his father, F. M. Tull; where-
fore, he is made a party defendant to this action. That
plaintiffs had no knowledge or information of the fraud
set forth herein, until immediately before the commence-
ment of this suit.

The second cause of action is substantially the same as
the first, except that it relates to a note and mortgage for
$34,000 given by the father to the guardian on the 31st
day of December, 1889, and recorded on the 4th day of
January, 1890, and afterward, on the 7th day of April,
1892, released by the guardian; and also to the proceed-
ings leading up to the sale by the guardian to F. M. Tull
of certain other real estate, described in paragraph 11,
second cause of action, for the sum of $20,000; the report
to, and confirmation by, the court of the sale; the claim
that the children of F. M. Tull were the owners of the
undivided half of the last named real estate on the 12th
day of August, 1889. Paragraph 22 of the second cause
of action alleges that "said guardian invested the pro-
ceeds of his said sale in the note of F. M. Tull for $34,000,

which said note was secured by mortgage on that piece of real estate described as commencing at the northwest corner of block 19, in the city of Spokane, Washington, and running east, on the south line of Riverside avenue, 100 feet; thence south, parallel with the east line of Stevens street, 99½ feet; thence west, parallel with the south line of Riverside avenue, 100 feet, to the east line of Stevens street; thence, on said east line of Stevens street, to the place of beginning, with the buildings thereon; which is the same note and mortgage sued on herein and set forth. That said note of $34,000 contains also the debt of $14,000 owed by F. M. Tull to plaintiffs and Ernest B. Tull, and which is made the subject of the first cause of action joined herewith." It is also shown, in paragraph 24, that May 23, 1893, F. M. Tull gave an additional mortgage to the German Savings & Loan Society to secure the payment of $20,000, which mortgage covered all the property described in the plaintiffs' complaint.

The plaintiffs pray upon the first cause of action: That the release of the $14,000 mortgage be set aside and declared to be a fraud upon plaintiffs and void. That plaintiffs have a personal judgment against F. M. Tull for $14,000, and interest thereon from March 1, 1889; also the sum of $500 attorneys' fees. That the usual decree be made for the sale of said mortgaged premises in the manner provided by law, and that the proceeds of the sale be applied in payment of the amount found due plaintiffs herein, etc. That the defendants in this complaint named, and each of them, and all persons claiming under them subsequent to the mortgage above set forth, may be forever barred and foreclosed of and from all right, estate, title, interest, claim, lien, and equity of redemption of, in, to, or upon said mortgaged premises, and every portion of the same. That the mortgage claimed by the German Savings & Loan Society be especially declared subsequent to

plaintiffs' mortgage. That the plaintiffs may have execution against F. M. Tull, or against any other property not exempt from execution, for any deficiency, etc., after applying the proceeds of sale of said mortgaged premises, properly applicable thereto, toward the payment of whatever judgment they may recover against him in this cause of action. That the plaintiffs may become the purchasers of said property at such sale; that the purchaser may be let into possession thereof, upon production of the sheriff's certificate of sale thereof. That the plaintiffs may have such other and further relief in the premises as to this honorable court may seem meet, equitable and just. Upon the second cause the prayer is identical as to the kind of relief prayed for, and need not be repeated here.

The answer of the German Savings & Loan Society put in issue all the material allegations of the complaint, including those claiming for the plaintiffs and Ernest B. Tull ownership in fee of the undivided one-half of the real estate described in the complaint, and those charging fraud, conspiracy, and collusion between F. M. Tull, P. D. Tull and the German Savings & Loan Society to cheat and defraud the plaintiffs and their brother, and notice and knowledge on the part of the German Savings & Loan Society. In addition to a denial of the material allegations of the complaint, the defendant the German Savings & Loan Society interposed the following affirmative defenses, in substance:

First.—That the German Savings & Loan Society, being a corporation duly organized under the laws of the state of California, and duly authorized to transact the business of loaning money and taking security therefor in the state of Washington, upon the application of F. M. Tull therefor loaned him the several sums of money mentioned in the complaint: First, $40,000, afterward paid from insurance money; afterward $50,000; then $25,000 additional, which last two loans were taken up by a loan

of $100,000 from the German Savings & Loan Society to F. M. Tull, made on or about May 5, 1892. That finally, on or about the ———— day of May, 1893, a further loan was made by the said loan society to said F. M. Tull of $20,000. That these several loans were secured at the times they were made by mortgage duly executed and delivered by the said F. M. Tull upon the real estate, or some part thereof, described in the complaint; and in said loans, as was its custom and practice, respondent required the applicant, F. M. Tull, to make truthful and correct statements of the condition and title of the land upon which such loan was sought; furnish respondent's legal adviser a correct abstract of title thereto, duly certified by some reputable and reliable searcher of titles; and upon such statements so made and abstracts so furnished, and upon the certificate of respondent's legal adviser that the said F. M. Tull was the owner of a good title in fee to said premises, the said several loans were made, and mortgages taken, by the respondent; and that in making each and all of said loans and taking said mortgages as security therefor, the respondent had no knowledge or means of knowledge, other than the public records, concerning the title to said property; and the record of each of the mortgages in the complaint pleaded as having been given to said guardian showed the same to have been paid, satisfied, and discharged, and the entries of payment, satisfaction, and discharge of the said mortgages upon which respondent relied in making its said loans are the same releases of mortgages pleaded in paragraph 9 of plaintiffs' first and second causes of action, and that in making said loans and taking such mortgages given to respondent, it fully relied upon the truthfulness and good faith of said releases, discharges, and acknowledgments of payment as the same appeared of record; that the said mortgagee was authorized to make and file said releases and discharges, and respondent so believed, and without such belief on its part none of said moneys would have been loaned and advanced by it. That the attorneys employed by defendant as aforesaid to pass opinions upon such titles were skillful and competent attorneys, learned in the law.

Second—That F. M. Tull and Lucy A. Tull were mar-

ried on or about the 3rd day of March, 1870, and thereafter continuously, till about the 20th day of May, 1887, were residents, householders, and inhabitants of the state of Kansas. That on or about the 31st day of October, 1868, a law was enacted in that state creating district courts, and conferring upon them general jurisdiction; that on or before March 16, 1871, there was enacted into a law in said state an act entitled, "Divorce and Alimony," which defines the cases for which divorces may be granted, amongst which is that of adultery, which ever since has remained the law of Kansas. That on the 25th day of February, 1887, the defendant F. M. Tull, as plaintiff, filed his complaint in the district court of Kingman county, Kansas, against Lucy A. Tull, as defendant, alleging as a ground for divorce that the said Lucy A. Tull had, on divers times and at different places, committed adultery and had carnal intercourse with many persons in said complaint mentioned, and prayed that the bonds of matrimony be dissolved between them. That on or before the 23d day of February, 1871, the legislature of the state of Kansas enacted a statute entitled, "Commencement of Civil Actions," § 72 of which act provides, *inter alia,* that "service may be had by publication in * * * Actions to obtain a divorce when the defendant resides out of the state. * * * And in all actions where the defendant, being a resident of this state, has departed therefrom, or from the county of his residence, with intent to delay or defraud his creditors, or to avoid the service of a summons, or keeps himself concealed therein with like intent." Section 76 of said last-named act provides that in all cases where service may be made by publication, personal service of the summons may be made out of the state by the sheriff of the county in which such service may be made. Such summons shall be issued by the clerk, under seal of court, and directed to the defendant or defendants to be served, and shall notify him or them that he or they have been served by the plaintiff or plaintiffs, naming him or them, and requiring him or them to answer the petition naming him or them in the clerk's office, of the court, which shall be named, within sixty days from

10—23 WASH.

the day of service, or the petition will be taken as true
and judgment rendered accordingly.  Such service may
be proved by the affidavit of the person making the same,
before a clerk of a court of record, or other officer holding
the seal thereof, or before some commissioner appointed
by the governor of this state, under an act providing for
the appointment of commissioners to take depositions,
etc.  Provided, that such service, when made and proved
as aforesaid, shall have the same effect as service obtained
by publication, and no other or greater force or effect.
That said act and each and every section thereof, took
effect on or about the 23d of February, 1871, and was,
and now is, a general law of the state of Kansas, in full
force and effect, unrepealed and unamended. That there-
after personal service of the summons and complaint was
made upon the defendant Lucy A. Tull in the state of
California, and thereafter, on the 20th day of May,
1887, the said district court having jurisdiction of the
subject matter and of the parties thereto, granted the
prayer of the said plaintiff, and then and there duly and
regularly ordered and decreed and entered a decree, then
and there forever dissolving the bonds of matrimony
before that time existing between the said plaintiff and
the said Lucy A. Tull, by reason of the faults, miscar-
riages, and aggressions of said defendant Lucy A. Tull,
as set out in his said complaint, and that thereafter, and
until the subsequent marriage between them, the said F.
M. Tull and Lucy A. Tull became and remained single
persons.  That while the said F. M. Tull was a resident
of, and domiciled in, the state of Kansas, he acquired
property consisting of goods, chattels, choses in action,
and money of the value of $35,000, and owned and pos-
sessed said property in said state of Kansas on the 20th
day of May, 1887.  That section 646 of said act entitled
"Divorce and Alimony" provides that, "If the decree
shall arise by reason of the fault or aggression of the
wife, she shall be barred of all right of dower in the lands
of which her husband shall be seized at the time of the
filing of the petition for divorce, or which he may there-
after acquire, whether there be issue or not; and the court
shall order restoration to her of the whole of her lands,

tenements or hereditaments not previously disposed of, and also such share in her husband's real or personal property or both as to such court may appear just and reasonable." Section 647 provides: "A divorce granted at the instance of one party shall operate as a dissolution of the marriage contract as to both, and shall be a bar to any claims of the party for whose fault it is granted, or to the property of the other," etc. That on or before the 31st day of October, 1868, by the legislature of the state of Kansas, there was duly and regularly passed and enacted, as a law of said state, an act entitled "Descents and Distributions." Section 8 of said act provides as follows: One-half· in value of all the real estate in which the husband, at any time during the marriage had a legal or equitable interest, which has not been sold on execution or other judicial sale, and not necessary for the payment of debts, and of which the wife has made no conveyance, shall, under the direction of the probate court, be set apart by the executor as her property, in fee simple, upon the death of the husband, if she survives him; provided, that the wife shall not be entitled to any interest, under the provisions of this section, in any land to which the husband has made a conveyance, when the wife at the time of the conveyance is not, or never has been, a resident of the state. ＊  ＊  ＊" Section 28 provides as follows: "All the provisions herein made in relation to the widow of a deceased husband shall be applicable to the husband of a deceased wife. Each is entitled to the same rights or portion in the estate of the other, and like interests shall in the same manner descend to their respective heirs. The estates of dower and curtesy are abolished." That said act, and each and every section and part thereof, took effect October 31, 1868, and ever since has been, and now is, a general law of the state of Kansas, in full force and effect, unrepealed and unamended. That the said Lucy A. Tull, her heirs, assigns, administrators, or legal representatives, under or by virtue of the laws of the state of Kansas, has or had no other right or interest in and to the said property of the said defendant F. M. Tull, neither real nor personal, except that given by the laws of the said state of Kansas

hereinabove last mentioned, and which interest, if at all, became vested in the realty only, in the event of said F. M. Tull's death. But that on the dissolution of the said marriage aforesaid and her death, the interest of the said Lucy A. Tull, her heirs, assigns, administrators, or legal representatives in or to the said property of the said F. M. Tull, ceased to exist, under said laws, and the said F. M. Tull, under the laws of the state of Kansas, then and there became, and thereafter remained, the owner of the said property, free from any interest, absolute or contingent, present or remote, of his said former wife, Lucy A. Tull, or her heirs, assigns, executors, administrators, or legal representatives. Then follows the allegation of the conversion by F. M. Tull of his property, real and personal, into money, and his removal to this state; the purchase of the property after the divorce with the money brought by him from, and acquired by him, in the state of Kansas, and obtaining a deed for a part thereof June 17, 1887, and the balance August 19, 1887, the remarriage of F. M. Tull and Lucy A. Tull, August 13, 1887, and her death July 18, 1888. It was further pleaded that the said Lucy A. Tull never had any interest in the property described in the complaint; that the guardian's sales of the undivided half of a portion of said property for $14,000, and of the other portion for $20,000, were made by mutual mistake of said F. M. and P. D. Tull, and under the mistaken belief that Lucy A. Tull was in her lifetime, by virtue of being the wife of F. M. Tull, the owner of the undivided half-interest therein as the community property of F. M. and Lucy A. Tull, as husband and wife; that no title, interest, right, or claim thereto passed to the said plaintiffs or the said Ernest B. Tull by reason of the death of the said Lucy A. Tull; and that the sole consideration for the said notes of $14,000 and $34,000 was the supposed interest of the said plaintiffs and Ernest B. Tull in said real estate, and that the said notes were wholly without consideration and void. That the money loaned by the German Savings & Loan Society to F. M. Tull was so loaned with the understanding and agreement that the same was to be, and in fact was, used in the making of permanent

improvements upon said property, and the removal of divers and sundry liens thereon. That F. M. Tull became insolvent prior to the foreclosure of the German Savings & Loan Society's mortgages, and continues so to be. That the property is scant security for the mortgage indebtedness. It was further pleaded in said second affirmative defense that on the 10th day of December, 1894, F. M. Tull, as plaintiff, began an action in the superior court of Spokane county against P. D. Tull, as guardian of said Dora May Dormitzer, Ernest B. and William L. Tull, and, upon allegations substantially the same as those hereinbefore pleaded, the court made and entered a restraining order in accordance with the prayer of the complaint, enjoining and restraining the said P. D. Tull, until the further order of the court, from negotiating, selling, disposing of, or in any wise contracting, concerning the promissory note described in the complaint, so as to prejudice the rights of the plaintiff to have the same delivered up and canceled as prayed in the complaint, of which said restraining order the said P. D. Tull was duly notified by the service upon him of a copy thereof and otherwise, which said restraining order still remains unvacated and of force, and said action still pending.

The cross-complaint and answer of the guardian *ad litem* is identical with the complaint filed by the plaintiffs, except as to the relief prayed for. The plaintiffs pray for the foreclosure of two mortgages. The guardian *ad litem,* however, prays:

"That all the proceedings had in the matter of the estate of William L. Tull, as against this defendant, be declared void, and of no force and effect and a fraud upon said defendant; that this defendant, Ernest B. Tull, be declared to be the legal owner of an undivided one-third of one-half of the real estate mentioned in said cross-complaint; that the deeds, conveyances, or mortgages held by the German Savings & Loan Society, as against this defendant, to said property be canceled, set aside, and held for naught; and that said defendant deliver to said

Ernest B. Tull a deed of conveyance to an undivided one-third of one-half of the said real estate, or that some person be appointed by this honorable court to do it for said defendant, and in case this cannot be done and this relief decreed to Ernest B. Tull, then this defendant prays for foreclosure of the mortgages," as was prayed for by the plaintiffs.

To this alleged answer and cross-complaint of the said minor defendant, the defendant, the German Savings & Loan Society, interposed the same answer and defense as were made to the plaintiffs' complaint, and therefore need not be repeated in this connection.

To these affirmative answers and defenses made by the German Savings & Loan Society the plaintiffs and the guardian *ad litem* on behalf of the minor, Ernest B. Tull, on or about the 12th day of May, 1898, filed replications. To the first affirmative defense the reply admitted nearly all the material allegations, and, among other things, it was admitted that F. M. Tull and Lucy A. Tull were inter-married and became husband and wife on March 3, 1870, and resided in Kansas up to and prior to May 20, 1887; and that F. M. Tull purchased the property described in plaintiffs' complaint; that F. M. Tull prior to the foreclosure of the mortgages given to the German Savings & Loan Society, became and continues insolvent. By way of second reply to said first affirmative defense, it was alleged: That the abstracts of title relied on by the German Savings & Loan Society in making its loans were imperfect and defective in every respect, in that said abstract failed to show that P. D. Tull, as guardian, ever gave the requisite security, as such guardian, as the law required, and alleges that P. D. Tull never gave and executed a bond required by the laws of the territory and state of Washington, and that the probate court of the said territory never took from P. D. Tull, as guardian

of the plaintiffs, any bond, with approved sureties, payable to the territory of Washington, in a sum double the defendant's estate, real and personal, as by the statutes made and provided. That P. D. Tull filed in the probate court an instrument which purported to be his bond as guardian, executed on the 23d day of July, 1888, conditioned in the sum of $9,600, that the sureties thereon are F. M. Tull, defendant herein, and one C. H. McCamant; that the said McCamant has not been a resident of the state of Washington for upwards of six years last past; that he is insolvent and has no property of any kind in this state; that F. M. Tull is, and has been since the 23d day of July, 1888, unable to pay his debts; that said sureties on said bond did not justify, according to law; that said bond was not in double the amount of the defendant's estate, real and personal; that the estate of the plaintiffs, at the date of the said guardian's appointment, was of the value of $50,000 and upwards; that the inventory shows said estate to be valued at $35,000; that said order appointing P. D. Tull guardian was made by the said probate court without any compliance with § 1136, 2 Hill's Code of the state of Washington, and of § 1612, Laws of Washington Territory for 1881 and 1883; that said abstracts of title are imperfect, defective, and not to be relied on in this, to-wit: That they do not show that said guardian, after each of the sales of the defendant's real estate to F. M. Tull, complied with § 1624, Laws of Washington Territory for 1881 and 1883, nor § 1143, 2 Hill's Code, and alleges that neither the proceeds of the said sale, nor the notes, nor the obligation, nor other security taken to secure the purchase money at said sale, were produced at the term of said probate court next after said sales, nor was there a report made by said guardian, and alleges

that said sales, and each of them, were confirmed by said probate court without compliance with said laws just above mentioned. That said abstracts mentioned in defendant's answer to the complaint and cross-complaint did not show the true state of the title of said property; that, in so far as said abstracts of title state anything, all the fraudulent schemes of the defendants and the fraudulent acts and facts set out in defendant's cross-complaint fully appear.

By way of reply to the second affirmative defense of the German Savings & Loan Society to the complaint and cross-complaint, it is pleaded: That the divorce mentioned in said answer was procured by fraud practiced upon Lucy A. Tull; that no process was ever served upon her in said divorce action; that about the 1st day of May, 1887, F. M. Tull and Lucy A. Tull left the state of Kansas and never thereafter resided in said state; that just immediately prior to their departure from said state, and when in the act of boarding a railroad train, a person, to defendant unknown, handed Lucy A. Tull certain papers; that F. M. Tull, before his wife could read or examine the same, took said papers from Lucy A. Tull, saying that he knew what said papers were for and that he would attend to the same; that Lucy A. Tull never thereafter saw said papers and never knew their contents, until two months thereafter, when she was informed that the same was a complaint against her containing an action for divorce commenced by F. M. Tull; that, as soon as Lucy A. Tull discovered that F. M. Tull had secured a divorce from her in Kansas, she commenced an action in the district court of the territory of Washington in and for the fourth judicial district, holding terms at Spokane Falls, on the 26th day of July, 1887, to recover from F. M. Tull an undivided one-half interest in the property

described in defendant's cross-complaint, alleging that the same was community property of herself and F. M. Tull, and that she be declared to be the owner of one-half thereof, and that said Tull had obtained a divorce from her by fraud, which said complaint in said action is set forth *in haec verba;* that soon after said action was commenced, upon advice of counsel, the parties thereto came to a settlement and compromise upon the terms: (1) That they should remarry; (2) Tull should acknowledge the claims made by Lucy A. Tull in her complaint to the property therein described, to-wit, that said property was community property; (3) that the divorce in Kansas, so far as the parties were concerned, should be declared null and void. That pursuant to said settlement and compromise said action was dismissed, the parties remarried and the property thereafter owned and enjoyed by said parties as community property, and they shared and shared alike until after the death of Lucy A. Tull; that said F. M. Tull accepted the terms of the said settlement, fully understanding their scope and extent, and all his legal rights in the premises.

And, for a further reply to the answer of the defendant, it is pleaded: That on the 18th day of October, 1894, P. D. Tull, as guardian, was ordered by the superior court of this county to show cause why he did not make a report of his acts and doings as guardian. Said order was made at the instance of plaintiff Dora May Dormitzer and her husband; that the hearing of said show-cause order was, at the request of P. D. and F. M. Tull, continued until December 22, 1894; that at the time said show-cause order was sued out, October 18, 1894, the said Tulls, being insolvent and being unable to account for the money and property of the wards, and in order to avoid the settlement of their accounts in

the superior court, offered to settle and compromise for a
small percentage of the amount due and owing to plaintiffs
and their brother, which offer was rejected and thereupon
the said Tulls, by duress and threats, sought to compel
plaintiffs and their brother to accept their terms of com-
promise, informing them that if they did not take what
was offered as settlement, they would see to it that they
got nothing out of the estate left by their mother; and
thereupon, the 10th day of December, 1894, F. M. Tull
commenced an action in the superior court to declare the
property in this litigation to be his separate property,
and that the guardianship proceedings herein, and every
step taken therein, was a mistake; that the claims made
by Tull in said action are false and fraudulent, and were
concocted by him to compel the plaintiffs and their brother
to accept the compromise, and to cheat and defraud them
of their property; that all the alleged facts contained in
the German Savings & Loan Society's second affirmative
defense were gleaned from said complaint of F. M. Tull,
and up to December 10, 1894, F. M. Tull had always
admitted said property belonged to himself and wife,
and after her death that one-half thereof belonged to the
plaintiffs and their brother. It alleges knowledge of those
facts on the part of the German Savings & Loan Society;
that all the matters set forth in the second affirmative
defense of the German Savings & Loan Society have
no foundation whatever, and are being employed pursuant
to a conspiracy entered into heretofore by said German
Savings & Loan Society to cheat and defraud the plain-
tiffs and their brother. It is alleged, as a further reply,
that the defense stated in defendant's answer, the Ger-
man Savings & Loan Society, did not accrue within two
years before the filing of said answer, and for a further
reply they deny each and every material allegation con-

tained in the answer of the German Savings & Loan Society to the complaint and cross-complaint of plaintiffs and their brother.

Thereafter, on or about the 14th day of September, 1898, by leave of court, the said plaintiffs and the said guardian *ad litem* file further replies, which are to be construed as part and amendatory of the replies theretofore filed, the first of which denies all of the allegations of the first affirmative answer of the German Savings & Loan Society, except the allegations in regard to the giving of different mortgages mentioned therein to the German Savings & Loan Society, and the foreclosure of the mortgages for $100,000 and for $20,000, and that the German Savings & Loan Society became the purchaser of the premises and is now in the possesion thereof, pursuant to such foreclosure and purchase. And, for reply to the second affirmative answer and defense set forth by the German Savings & Loan Society, admits the marriage of Lucy A. Tull and F. M. Tull, March 3, 1870, but alleges that they were and remained husband and wife until the death of Lucy A. Tull, on or about the 18th day of July, 1888, and denies having any knowledge or information sufficient to form a belief as to any and all of the allegations in the second paragraph of said amended answer and defense, down to and including the thirty-second paragraph of said amended answer, and therefore denies the same. And, for further reply to the second amended answer admits that F. M. Tull converted all his property in the state of Kansas into money and removed with it to the state of Washington, but alleges that said property had been so converted, and the said F. M. Tull had established his residence in the state of Washington, on or prior to January, 1887. Admits the conveyance by James N. Glover on June 17, 1887, of the

premises described in the complaint, beginning on the south line of Riverside avenue, 90 feet east of the northwest corner of block 19; running thence east, along said south line of Riverside avenue, 60 feet; thence south 179 feet, more or less, to Sprague avenue; thence west, along Sprague avenue, 60 feet; thence north to the place of beginning. That on the 19th day of August, 1887, said Glover conveyed to F. M. Tull the property beginning at the northwest corner of block 19; thence east, along the north line of said block 19, 90 feet; thence south, at right angles with said north line, 90 feet, more or less; thence westerly, with the said north line, 90 feet, to the west line of said block 19; thence north, along the said west line, to the place of beginning. That the contract for the purchase of said last mentioned property or premises was made and entered into between said Glover and Tull on the 28th day of December, 1886, and denies each and every other allegation in paragraph 3 of said affirmative answer and defense; denies knowledge sufficient to form a belief as to whether or not a divorce was granted between said Lucy A. Tull and F. M. Tull on the 20th day of May, 1887, or at any other time, or at all; but, on the contrary, alleges that said Lucy A. Tull and F. M. Tull were and remained husband and wife from the time of their marriage until the death of the said Lucy A. Tull. Denies each and every allegation contained in paragraphs 5 and 6 of said second affirmative answer and defense. Denies knowledge sufficient to form a belief as to the matters alleged in paragraphs 7 and 8. Admits the commencement of the action by Tull on the 10th day of December, 1894, but denies knowledge as to whether the allegations are true. For further reply, it is alleged that the suit of F. M. Tull

against Dora May Dormitzer *et al.* has, by order of this court, been dismissed.

F. M. Tull and Lucy A. Tull intermarried in 1871, in Missouri, and $100 would cover all the property the husband had at the time of his marriage. His wife had no property. They lived in Missouri a short time, and thereafter in Kansas until December, 1886, or January, 1887. The wife accumulated about $1,300 worth of property in Missouri. In Kansas the husband carried on the furniture business and accumulated quite an amount of property, real and personal. In the fall of 1886, for the purpose of changing location and residence, the hus- band sold out his furniture business and his real estate, and, after settling up his business affairs in Kansas, he had about $25,000. This property was all accumulated through the business management of the husband in Kan- sas, while the husband and wife were residing there with their family. In December, 1886, the husband came to Spokane Falls and contracted to purchase, for $10,000, from James N. Glover and wife, the property in contro- versy in this action. In June, 1887, a deed was executed by Glover and wife to the husband for part of this prop- erty. On the 19th of August, 1887, the remainder of the property in controversy was conveyed by Glover and wife, under the contract, to the husband. In May or June, 1887, the husband commenced to build on this property a business block. The first building erected was of brick, 50 by 100 feet, three stories high, and therein the husband opened up a furniture store. The building was finished in August, 1887. On the remainder of the property another expensive building was in the course of construction, the foundation and one story having been erected, when, on July 18, 1888, the wife died intestate, at Spokane Falls, while living there with her husband

and their children. The money from the Kansas property, and the wife's money from the Missouri property, and the earnings of the husband in the furniture business in Washington were applied to purchasing the said property, building the improvements thereon, and in carrying on the furniture business at Spokane. At the time the wife died she left surviving her, issue of said marriage, three children, William L., then about fourteen years of age, Dorothy May, then about ten years of age, and Ernest B., then about four years of age. The plaintiffs Dora May Dormitzer and William L. Tull, are two of these children of lawful age at the time this suit was brought, and Ernest B. Tull, one of the defendants, is the other child, a minor at the time the suit was brought. Mr. Tull sold out his furniture business in Spokane in August, 1888.

On the 25th of February, 1887, the husband instituted against his wife a suit for divorce in the district court of Kingman county, Kansas. The facts concerning this suit are hereafter more fully set out. In July, 1887, the wife came with her children to Spokane Falls. On her arrival she immediately commenced a suit, in the district court of the territory of Washington, at Spokane Falls, against F. M. Tull. Service of summons in this suit was made on F. M. Tull, July 28, 1887. The complaint in that action alleged the marriage of the plaintiff and defendant in Missouri; the birth of the children; that during the first year of their married life they lived in Missouri, then went to Iowa, and lived five years, and then to Kingman, Kansas; that the plaintiff had at all times conducted herself as a faithful wife; that the defendant, about the first of November, 1886, formed improper relations with a servant girl in their employment, and conceived and commenced the execution of a plan

by which to deprive the plaintiff of her rights as his
wife, and of her interest in the property, real and per-
sonal, belonging to the plaintiff and defendant; that he
concealed said plan from the plaintiff, and that she did
not know of the same until within a few days; that in
pursuance of said plan the defendant pretended to plain-
tiff, and so informed her, that he would go to the state
of California and select a place of business and home
for the plaintiff and defendant; that he would thereafter
return to Kansas and take the plaintiff and her minor
children with him to the state of California to live; that
in December, 1886, the defendant left his home in
Kansas, came to Spokane Falls and entered into a con-
tract for the purchase of real property (being the same
real property in controversy in this action), and made
preparations to move to Washington Territory, to live
there and to engage in business there; that the defendant
took said servant girl with him, but concealed the fact
from the plaintiff and concealed from her the fact that
he had gone to Washington Territory and purchased the
property mentioned; that on or about the 8th of Jan-
uary, 1887, the defendant returned to the home of the
plaintiff and defendant in Kansas and informed the
plaintiff that he had been to the state of California, but
concealed from the plaintiff that he had been to the Ter-
ritory of Washington; that at this time the plaintiff and
defendant were owners of real property of the value of
about $60,000, and of personal property, of the value of
about $20,000, situated in the state of Kansas; that this
property was the common earnings and accumulations of
the plaintiff and defendant during their marriage; that
by the laws of the state of Kansas a married man could
not sell and convey real property without his wife joining
him in the deed of conveyance by which the same was

to be conveyed; that in pursuance of the fraudulent plans of the defendant, and to deprive the plaintiff of her rights in said property and of her position as a wife, the defendant falsely pretended to plaintiff that it would be for the best interest of the plaintiff and defendant to sell their property, and that if the plaintiff would join with the defendant in the sale and conveyance thereof he would take the plaintiff and her minor children and the proceeds of the said property and settle in the state of California, and reinvest the proceeds in property and business in the state of California for the benefit of the plaintiff and defendant; that the plaintiff believed these promises and representations to be true and made in good faith and relied upon the same, and by reason thereof, at the request of the defendant, joined with the defendant in the deeds and conveyances of said property, and the property in Kansas was sold by the defendant for the sum of $80,000, and the proceeds of such sale retained by him; that in pursuance of said fraudulent plan the defendant, on or about the 14th of February, 1887, prevailed upon the plaintiff to visit her father's home in Missouri, where she was to wait a short time, when the defendant would come and accompany her to the state of California; that after the departure of the plaintiff, as requested, to her father's, the defendant traveled about with the said servant girl and passed said servant girl off as his wife; that about this time the defendant conceived the idea of kidnapping and taking from the plaintiff her two young children, then in the custody of her father in Missouri, and that in the absence of the plaintiff from her father's home, defendant took the children to Des Moines, Iowa, where the plaintiff recovered them, and where the plaintiff found the husband living with said servant girl; that the husband then con-

fessed his adulterous conduct with said servant girl, but promised the plaintiff that, if she would forgive him, he would thereafter live with her as a faithful husband and would reform his course of life; that on or about the 7th of March, 1887, the plaintiff and the defendant went to the city of Sacramento, at the defendant's request and upon the representation that he desired to make California his home. The defendant then pretended that he had broken off all improper connection with said servant girl, but the truth and the fact was, as the plaintiff subsequently ascertained, the defendant procured said servant girl to go to the town of Cheney, Washington Territory, and to remain there until he, the defendant, would join her for the purpose of resuming his adulterous relations with her; that all this was unknown to the plaintiff until recently; that on the 18th of March, 1887, the defendant left the plaintiff at Sacramento, stating that he was going to Portland, Oregon, and about the first of April the defendant came back to Sacramento with the said servant girl and compelled the plaintiff, by threats and pretenses, to allow the girl to remain with them; that the plaintiff at the time of the defendant's return was sick in bed and was among strangers, and did not have the physical strength and will to assert her rights in the premises, and that the defendant and the said girl represented to her that no improper relations existed or would thereafter exist between them; that on or about the 11th of May, 1887, the defendant left plaintiff in Sacramento, California, to be gone for two weeks, pretending that he was going to Kansas for the purpose of settling up some unfinished business. The plaintiff alleged that the promises of good and virtuous behavior on the part of the defendant were made to her with the

intention of deceiving her, to throw her off her guard, and to prevent investigation upon her part into the conduct of the defendant, and was done with the fraudulent and dishonest design to procure a divorce from the plaintiff unknown to her, and without serving of process upon her, and with the intention to deprive her, not only of her position as a wife, but of all her interest in and to the real estate and personal property owned by them; that during all such times the defendant was keeping up improper relations with the said servant girl; that on or about July 5, 1887, the plaintiff, not having heard from her husband, and having heard that he had taken up a residence at Spokane Falls, left the state of California for the purpose of joining her husband at Spokane Falls; that the defendant had lived and cohabitated with plaintiff up till about the middle of May, 1887, when he left her at Sacramento; that the defendant, after the plaintiff had left Kingman, Kansas, filed a pretended bill for divorce against the plaintiff, the grounds, nature, and extent of which were unknown to the plaintiff; that the plaintiff had sent for the proceedings in said action, and when she had procured a certified copy of the same, desired to make the same a part of the complaint; that plaintiff had had no notice of any such proceedings or a suit pending or determined till about the 15th day of July, 1887, when she was informed by a telegram from Kingman, Kansas, that a divorce had been granted. The complaint alleges that the plaintiff was entitled to own and control one-half of the property owned by the defendant; also to have her children supported and maintained out of the proceeds of the property. An injunction is prayed for, to prevent the defendant from disposing of the property and the prayer is that the decree of divorce obtained in Kansas be set aside as fraudulent, that she be decreed

to be the owner of one-half of the property (being the property in controversy in this action), and that the husband be required to pay attorney's fees and to provide for her support and the support of her family, etc. On the 30th of July, 1887, without the knowledge of the attorneys who brought the suit for the wife, the husband and wife signed a stipulation dismissing the action. The testimony shows that the husband and wife then agreed to a settlement of their difficulties. He testifies:

"Well, we simply agreed to fix up our past, our differences, and remarry; let her have the interest in the property as she had. * * * I say, we agreed to remarry, *and she would withdraw the suit,* and she should have an interest in the property, and there was no specific amount she should have, that she should have the interest in the property and settle up the business as man and wife, *and the property be together.* That was all there was to it."

On the last of July, or first day of August, 1887, F. M. and Lucy A. Tull went through the ceremony of remarrying, and continued to live together thereafter with their family, in Spokane, until Lucy A. Tull died, July 18, 1888. On May 8, 1888, F. M. Tull made application to the German Savings & Loan Society for a loan of $40,-000 on part of the property in controversy. This loan was not perfected until after the probate proceedings hereinafter mentioned. This loan had been agreed upon, but not consummated, when Mrs. Tull died. This loan, as well as the other loans hereinafter mentioned, were negotiated as hereinafter stated. Mr. F. M. Tull first talked about this loan with Horace Cutter, cashier of the First National Bank of Spokane, in the spring of 1888. Mr. Cutter offered to secure the loan, and said it would be from the German Savings & Loan Society. A week afterwards B. Goldsmith, of Portland, Oregon, came to

Spokane to look over the property, and he made and delivered his application in writing to Mr. Goldsmith. Further facts as to the connection of Goldsmith and Cutter with the matter are set out hereafter. It is shown that, in December, 1889, J. M. Kinnaird prepared a certificate of title as to the Tull property, and had corresponded with Milton W. Smith, of Cox, Smith & Teal, and that Mr. Goldsmith was in consultation about that time with Mr. Kinnaird. Further facts as to Mr. Kinnaird's connection with the matter are hereafter set out.

On July 23, 1888, five days after the death of Mrs. Tull, P. D. Tull, a brother of F. M. Tull, filed in the probate court of Spokane county, Territory of Washington, a petition to be appointed guardian of the said children of Lucy A. Tull. The petition set forth the ages of the children and that said minors jointly owned in fee simple an undivided one-half interest in the property in controversy in this action. The petition further stated that there was no guardian appointed by law; that the children had no relations in said county other than petitioner and their father, F. M. Tull; that the petitioner was the uncle of said minors; and that said F. M. Tull requested that the petitioner be appointed guardian of such minors. On this petition was the following indorsement, signed by F. M. Tull:

"F. M. Tull, having read the foregoing petition, says he is the F. M. Tull therein referred to, and the father of the minors therein mentioned, and requests that petitioner, P. D. Tull, may be appointed guardian of said minors."

On the same day an order was made by the court, appointing said P. D. Tull guardian of said minors, and the bond of said guardian was fixed at the sum of $9,600. Also, on the same day, the guardian filed his bond as

guardian with said F. M. Tull and one McCamant as sureties thereon. The guardian qualified as such, and letters of guardianship were issued to him on the 24th of July, 1888. On the 28th of July, 1888, the guardian made an inventory of the property of his wards—the property in controversy—and filed the same in the probate court the first of August, 1888. On the first of August the guardian filed in said probate court his petition to be allowed to sell a part of the property in controversy. On the same day an order to show cause was made. On the 3d day of September an order was made by the probate court, directing said guardian to sell a portion of the real estate in controversy at public auction to the highest bidder for cash, after giving notice as required by law, and the guardian, before making said sale, was required to enter into a bond in the sum of $28,000, conditioned as provided by law. On September 24th this bond was filed, with one Jackson and the said F. M. Tull as sureties thereon, and the same was approved by the probate court. Notice of sale was given as required by law and the order of the court, and on November 26, 1888, the guardian made report to the said probate court that he had sold all the right, title and interest of said minors in part of the property in controversy in this action, at public auction, to the highest bidder, for cash; that F. M. Tull bid the sum of $14,000 for the same, and that it was struck off to the said F. M. Tull for the sum of $14,000 cash, he being the highest bidder and that being the highest bid therefor. The guardian asked that the sale be confirmed, and that he be directed and authorized, on his complying with the terms of the sale, to execute and deliver to the purchaser a deed therefor. On the 27th day of November, 1888, said sale was confirmed by the probate court, and on the same day the guardian executed to

the said F. M. Tull a deed purporting to convey the interest of said minors in part of the property in controversy in this action, which deed was recorded in the auditor's office in Spokane county on the 30th day of November, 1888. On the 6th day of December, 1888, the said F. M. Tull made to the German Savings & Loan Society his mortgage on the property described in the guardian's deed, for the sum of $40,000, and this mortgage was, on the 21st of December, 1888, acknowledged before the said J. M. Kinnaird, as a notary public, and filed for record in the auditor's office of said Spokane county, at the request of the First National Bank. By a mortgage acknowledged the 6th day of March, 1889, F. M. Tull mortgaged the same property to P. D. Tull, as guardian of the said minors, to secure the sum of $14,000, which mortgage was recorded on the 8th day of March, 1889. On the 7th of March, 1889, the said guardian reported to the probate court of Spokane county—which report was approved and confirmed—that he had received the sum of $14,000 as proceeds of the sale of a portion of the real estate of said minors, under the order of the court, that he had invested the funds in the note of F. M. Tull for $14,000, dated March 1, 1889, due five years after date, with interest payable annually at the rate of ten per cent. per annum, and that the said note was secured by a mortgage executed by F. M. Tull on the property described in said guardian's deed to F. M. Tull. · He petitioned that his action be confirmed and that the bondsmen be discharged and released from the obligation of the bond of the guardian upon the sale of said real estate. The court granted the order as petitioned for, and discharged said bondsmen. In 1889 the buildings situated on that portion of the property first deeded by the guardian to F. M. Tull, and mortgaged to the German Savings & Loan

Society for $40,000, were burned, and out of the insur-
ance money the $40,000 loan was paid back to the society,
and a release and satisfaction of the mortgage was made
to said respondent, which release was filed and recorded
in the auditor's office of Spokane county on November 11,
1889. On August 12, 1889, the said guardian petitioned
the court for the sale of the other portion of the property
in controversy in this action, and in said petition referred
to the inventory filed on the 31st of July, 1888. The
petition describes the property petitioned to be sold, and
recites that said minors owned an undivided one-half in-
terest in the same jointly and equally with their father,
F. M. Tull, who owned the other half. The petition re-
cites that a fire had destroyed the buildings on the prop-
erty, that the minors had no property with which to re-
build, and that a better investment could be made by
selling the property and investing the proceeds thereof
in mortgage loans upon real estate in the city of Spokane
Falls, or in such other real estate as the court might from
time to time direct. This petition also recites that the
real estate was incumbered by two mortgages, one for the
sum of $10,000, due November 25, 1889, and the other
to secure two notes of $5,000 each, payable to J. M. Glover;
and, further, that there were insurance policies on the
buildings when they were burned, sufficient to cover the
first mortgage, but not sufficient to pay both thereof, and
that the minors had no means to pay off all the mortgages.
This petition and order to show cause was made on the
12th day of August, 1889; notice of the same was duly
given, and on September 14, the court appointed A. J.
Shaw as guardian *ad litem* of the said minors, for the
purpose of appearing for, and taking care of, their in-
terests in the proceedings. On the 14th of September,
1889, an order of the court directing the guardian to sell

said property was made, and the guardian was required, before making such sale, to enter into a bond in the sum of $40,000, conditioned as provided by law. This bond was filed the 25th of October, 1889, with F. M. Tull and one Fotheringham as sureties. On the 30th of November, 1889, the guardian reported to the court that he had offered said property for sale at public auction to the highest bidder upon the terms required by the court —that is, for cash—and that he struck the same off to F. M. Tull for the sum of $20,000 cash, the said F. M. Tull being the highest and best bidder. The sale was confirmed by the court on the 10th of December, 1889, and the guardian was directed to convey the property to F. M. Tull upon his complying with the terms and conditions of the sale. On the 10th of December, 1889, such conveyance was made and the deed was filed for record in the auditor's office of Spokane county on the 11th day of December, 1889. On the 26th day of October, 1889, F. M. Tull mortgaged to the German Savings & Loan Society, for $50,000, the property purchased by him at the first guardian sale, and on which the mortgage for $40,000 had been given. This mortgage was acknowledged before J. M. Kinnaird, as notary public, and was filed for record in the auditor's office the 28th day of October, at the request of J. M. Kinnaird. On the 7th day of September, 1889, P. D. Tull, as guardian of said minors, executed a release of the $14,000 mortgage on the same property, in which he recited that the debt secured had been fully paid and discharged, and this release was filed for record on September 11, 1889, in the auditor's office of Spokane county. On the 30th day of December, 1889, F. M. Tull mortgaged a part of the property in controversy in this action to the German Savings & Loan Society for the sum of $25,000, and on the same day the same

was filed for record in the auditor's office of said Spokane county. This mortgage is witnessed by J. M. Kinnaird. On the 31st day of December, 1889, F. M. Tull mortgaged to P. D. Tull, as guardian of said minors, all of the property, including his half interest, purchased at the first guardian sale, to secure the payment of $34,000, with interest at ten per cent. per annum, according to the conditions of a promissory note made by F. M. Tull to said P. D. Tull, as guardian of said minors. This mortgage was filed for record in the auditor's office of said Spokane county, on January 4, 1890. On the 7th day of April, 1892, a marginal satisfaction on the $34,000 mortgage, in the words following, was entered in the auditor's office of Spokane county, viz:

"This mortgage and note secured thereby fully paid, satisfied, and discharged this 7th day of April, 1892. P. D. Tull, for the heirs. (Seal.)   Attest: J. J. L. Peel, auditor, by W. H. Hosler, deputy."

On the 20th day of May, 1892, F. M. Tull filed, in the auditor's office of said Spokane county, a release of the German Savings & Loan Society of the $25,000 mortgage hereinbefore mentioned. On the same day he also filed in said auditor's office a release of said society of the $50,000 mortgage hereinbefore mentioned. On the 5th day of May, 1892, F. M. Tull gave to the German Savings & Loan Society a mortgage for $100,000 on all the real estate in controversy in this action, except sixty by eighty feet on Sprague avenue, which mortgage was filed for record in said auditor's office on the 5th day of May, 1892, at the request of Kinnaird & Happy. On the 23d day of May, 1892, F. M. Tull gave to the German Savings & Loan Society a mortgage for $20,000 on the sixty by eighty feet on Sprague avenue, which mortgage was witnessed by J. M. Kinnaird, and was filed for record

by Kinnaird & Happy in the auditor's office of said Spokane county on May 23, 1892. The two mortgages, one for $100,000, and the other for $20,000, were foreclosed in the United States circuit court for the eastern district of Washington, and judgment rendered thereon for the full amount of said mortgages, with interest and costs, and thereafter, at the master's sale of said premises upon said decree of foreclosure, the entire premises described in the pleadings in this action were sold to satisfy said judgment and decree of foreclosure, at which sale the German Savings & Loan Society became the purchaser and received a certificate of such purchase from the master. The period of redemption provided by law has expired, and the master's deed to the whole of said premises has been executed by the master in said cause to the defendant German Savings & Loan Society. This deed has been approved and confirmed by the court and has been duly recorded in the auditor's office of Spokane county, and thereunder the German Savings & Loan Society ever since has been in the possession of the whole of said premises. In said action of foreclosure neither the plaintiffs in this action nor the defendant Ernest B. Tull were parties. In the probate proceedings Mr. Frank Graves, a reputable attorney of Spokane Falls, represented F. M. Tull and the guardian. He was examined as a witness in this cause, and testified relative to the inception of the probate proceedings in part as follows:

DIRECT EXAMINATION.

By Mr. Nash:

Q. Your name and occupation, Mr. Graves?

A. Frank H. Graves; practicing lawyer.

Q. Were you in Spokane in the years 1888 and 1889?

A. I was.

Q. What was the style of your firm at that time, Mr. Graves?

A.  Houghton, Graves & Jones.

Q.  Do you remember a proceeding in the probate court entitled, "In the Matter of the Guardianship of William L. Tull"?

A.  Yes, I remember the Tull probate proceedings.

Q.  I will ask you to examine these two petitions and say, if you can, in whose handwriting they are.

A.  That is my handwriting; I can tell that from here.

Q.  This petition is Plaintiffs' Ex. 9; there appear to be interlineations upon this petition, Mr. Graves, in a handwriting other than your own. I will ask you to look at these interlineations and say, if you know, who put them on that paper.

A.  I think I know. (Examining paper.) Yes, sir.

Q.  Who put them on?

A.  J. M. Kinnaird, deceased.

Q.  Who is J. M. Kinnaird?

A.  He was a lawyer practicing here at that time and subsequently judge of this court.

Q.  Explain how, and under what circumstances, and the facts fully, as to why that interlineation appears upon the face of that petition.

A.  Well, do you want I should recount the history of this proceeding, and Judge Kinnaird's relation to it, and mine, or just answer categorically your question?

Q.  You can state the facts leading up to the execution of that interlineation. Go on in your own way.

A.  Some time in the year 1888, I suppose about the date that this petition was sworn to, some time before this petition was sworn to, Mr. F. M. Tull came to our office, whether to consult with me individually or not, I don't remember; but, after some consultation, I did individually take charge of the matter. He represented to me that he was building; had commenced that summer, which I knew, of course, to erect a building upon his property, which we then knew as the Glover property; that for the purpose of erecting that building he had arranged to borrow money of the German Loan & Savings Society of San Francisco——.

Mr. Hughes: The German Savings & Loan Society.

A. (Continued.) Well, it is this German institution that has been loaning money here. That he had already proceeded part way in the erection of the buildings; that the mortgage had not been executed when Mrs. Tull had suddenly taken ill and died; the mortgage being unexecuted, that the company had refused to accept an execution of the mortgage by him alone; that he could not go on with the building unless he got this money; that he was then indebted for material and labor in considerable sums of money and no way of liquidating that indebtedness, and that the property would undoubtedly be sacrificed. He desired to devise some way by which the property could be saved, both for his minor children and himself, and desired advice in respect of that matter. I subsequently did advise him. He also said to me that any proceedings that were taken would have to be subject to the approval of Mr. Kinnaird, who, he said, represented the company.

Q. What claim, if any, did Mr. Kinnaird make?

A. Subsequently, Mr. Kinnaird—Mr. Tull employed me——

Q. Employed you?

A. Employed me, and subsequently Mr. Kinnaird called upon me; whether I saw him and mentioned it, or whether he came over to my office, I don't know, but anyhow, Mr. Kinnaird and I got together and I outlined to Mr. Kinnaird a plan that I thought would save the property, the children's interest, for them, and Mr. Tull's interest for him; and Mr. Kinnaird, I discussed it with him and he approved of it and said that, as far as he was concerned, he would pass the title. He either said at that time or said subsequently that he would have to communicate it to counsel at Portland, or San Francisco; my recollection is, now, Portland, and that the counsel were Cox, Smith & Teal, but I won't be perfectly sure of that; and either at that time or at some subsequent stage of the proceedings—and, I think, at that time—proceedings were delayed until he was able to communicate with them, advise them of the nature of the proceedings that were to be taken, and receive a reply from them. Sub-

sequently he did; he told me he had received a reply, and held in his hand what he said was a letter from the attorneys, while we discussed the thing at some length. Now, I don't know whether that was before any proceedings were taken, or whether that was at some stage in the proceedings; I don't know at all about that; but somewhere along there that was done. I then drew—had Mr. P. D. Tull appointed guardian at the suggestion of Mr. Tull, and bond given, and then drew the petition which has been handed me (Plffs' Ex. 9), which was submitted to Mr. Kinnaird, and he made the interlineations that. appear on the—well, all of the interlineations, I believe, that appear in it; at least these interlineations, that appear on next to the last page, that were pointed out to me.

Q.   Can you decipher the interlined words?

A.   Yes, sir; the words "or discharge the liabilities for labor and materials already placed thereon," and the words "is in such condition that no rents can be derived therefrom, and that the labor and materials placed thereon will be lost and said real estate;" he interlined those words. That petition was then filed and subsequent proceedings taken.   That is how Mr. Kinnaird came to make those interlineations.

Q.   I will ask you if, at the conclusion of every step in the probate proceedings, Mr. Kinnaird expressed his approval or disapproval of the acts and the papers filed?

A.   Oh, I don't know about that; Mr. Kinnaird was consulted by me as to every material step that was taken, but I don't suppose that I consulted with him, or that he expressly approved every detail of it.   I think Mr. Kinnaird would have trusted me to carry out our plan, but Mr. Kinnaird knew what was going to be done, and knew what had been done after it was done, and approved of it.

Q.   He was representing himself to be acting in the capacity of attorney for the German Savings & Loan Society?

A.   Oh, yes; he had no other—when I say he represented himself, I don't mean—I am not sure that he ever said in so many words to me that he was the attorney for

the company, but he was there in that capacity, professing to represent them. I understood he was representing them. He had no other business connection with it, except as the attorney, and I dealt with him as the attorney, and he dealt with me as Mr. Tull's attorney. Now, if you can understand how attorneys understand each other's relations without it being—I never put the categorical question to him, nor received the categorical statement, that I remember; I understood him to be representing them, and it was in that capacity I dealt with him; not otherwise.

Q.   Do you remember the period that Judge Kinnaird occupied the bench in this county?

A.   He was appointed some time in the spring of 1890, I think. My recollection would be soon after the legislature that year adjourned; anyhow it was that spring.

Q.   And thereafter your firm then consisted of Senator Turner and yourself?

A.   The firm from March, 1890, that I belonged to was Turner & Graves; the firm of Houghton, Graves & Jones was dissolved on the first of January, 1890; the firm of Turner & Graves was organized in March of the same year; I was a free lance between those two dates.

Q.   Your firm, then, became the attorneys for the German Savings & Loan Society?

A.   Very soon after Judge Kinnaird went upon the bench we were retained by this company; I don't remember the legal corporate title of it. We acted as their attorneys until Judge Kinnaird retired from the bench, when he resumed—I think soon after he retired from the bench he became their attorney again. I want you to understand, gentlemen, all of you, that I don't wish to be held to too great accuracy of dates here.

Q.   (Handing witness paper, Ex. 17). Look at that; examine that instrument, Mr. Graves, and look at the signature of the notary, especially, and the witnesses on the other side.

A.   Yes.

Q.   Do you know anything about the execution of that paper?

A.    What is it?   (Examining.)    No, I don't know anything about it.   No, sir, I don't remember of knowing anything about it now.    It might be that I did at the time; I hardly think so.

Q.    What, if any connection, had Mr. Kinnaird with that?

A.    I don't know, except what appears on the face of it.

Q.    Is that his signature there?

A.    It is his signature as a witness and as a notary public.

Q.    (Handing witness paper.)    Examine that paper.

A.    Yes.

Q.    Do you know Mr. Horace Cutter?

A.    Very well, sir.

Q.    What business was he engaged in in 1888 and 1889?

A.    He was the cashier of the First National Bank of this city.

Q.    Do you know anything about his agency of the German Savings & Loan Society?

A.    Well, sir, I know this about it; I know that during this Tull business that my attention has been called to, Mr. Cutter was professing to act as the agent, and I had consultation with him at one time with Mr. Kinnaird; possibly more than one time, but one time that I remember of.   I know that Mr. Cutter came to us before the receipt of this letter, and desired to know if the German Savings & Loan Society could retain us to do their business; that subsequently we received this letter which you hand me, and that subsequently Mr. Cutter did bring the papers named in this letter, and that subsequently, in our relations to the company as attorneys, we dealt with Mr. Cutter as the company's agent; that is to say, that Mr. Cutter—I don't know whether he made the loan, but he always brought the loans to us, the abstract of title, and so on, for examination.   Well, now, I don't want to be understood as saying that positively; my impression is that he would bring the abstracts to us; at all events, he consulted with us, and we dealt with him as the agent of the company in making a number of loans and doing the

company's business. I can recall some of the loans now, but probably not all. I have not seen that letter, since it was received, until just now.

Q. This is plaintiffs' Ex. 22, and is a petition for the sale. That is in your handwriting, also, is it not, Mr. Graves?

A. Yes, I can tell that from here. Those are the days when I could not afford a stenographer.

Q. In the sale of that piece of property you followed the same steps and the same proceedings as you followed in the sale of the first piece, did you not?

A. Well, I presume so, Mr. Nash; I expect, having once blazed out a successful trail, that I did not establish a new one, but I would not want to answer that positively; I think so.

Q. Did Mr. Kinnaird have the same connections with that sale of that piece of property as he had with the first one, do you remember?

A. In a general way, yes; of course, Mr. Kinnaird said to me, just to 'put it through the same as you did the first one,' and I got through it.

Q. I hand you plaintiff's Ex. 35 and plaintiffs' Ex. 38, and ask you if you know anything about Kinnaird's connection with those papers, and in what capacity he acted when those mortgages were executed.

A. I know nothing except what appears on the face of the papers; that is, of the first one. I will look at the other one. (Examing paper.) I know nothing about it, except what appears on the face of the papers; this is Mr. Kinnaird's signature here; I know his signature. Mr. Kinnaird's signature to both of them, where it purports to be, both as a witness and one as a notary; that is all I know about that, except by hearsay.

CROSS-EXAMINATION.

By Mr. Hughes:

Q. Mr. Graves, you say that, when Mr. Tull employed your firm, the matter came into your hands and you took charge of the conduct of these proceedings?

A. Yes, sir.

*a*

Q.   Your negotiations, or your conferences—I mean the conferences of your firm—were had on your part as a member of the firm, and with Mr. Tull?

A.   Yes, after the first consultation, at least; I don't remember about the detail of the first conversation, but I took charge of the business, anyhow.

Q.   Now, you say that·Mr. ·Tull explained to you the situation of his property, the fact that the loan was pending and uncompleted at the death of his wife, that the building was in course of construction, and there were claims that would result in ·mechanics' liens and in the ultimate sacrifice of the property, unless the loan could be consummated, and that he was advised it could not be consummated without some proceedings taken to make complete title to the property?

A.   Yes—now——

Q.   (Interrupting.)   And give the loan company, the German Savings & Loan Society, a first mortgage upon the property, in pursuance of the original application?

A.   ‚Yes, sir.   I want to say, in that connection, Mr. Hughes, with your permission, that I suggested to Mr. Tull the question as to whether it really was community property or not, the money having been brought here from another state; I knew of no other reason why it was not community property, except the reason that the money was brought from another state—that question that you probably heard mooted—but that was disposed of without any consideration, because the mortgage company would not take title with any doubt of that sort; they had to have a clean title.   Hence Mr. Tull and Mr. Kinnaird both conceded at the outset it to have been community property, and the children to have a one-half interest in it.   Hence, I commenced with that assumption.

Q.   You mean, it was conceded for the purpose of getting this loan?

A.   No, it was conceded—well, on the part of Mr. Tull, conceded for that purpose; I suppose of course that Mr. Kinnaird had no—did not care whether it was or not; he was not going to take any chances; but it was

12—23 WASH.

assumed by all parties to be community property; hence I gave myself no concern to that question, and did not inquire into any precedent facts. I started with the assumption that it was community property; Mr. Tull said he did not care much whether it was or not; he was perfectly willing that the children should have their interest in it, in any event, and I want to say, too, Mr. Hughes, with your permission, that when Mr. Tull employed me he said he employed me on behalf of himself and of the children, likewise, and I conceived there was no conflict between their interests.

Q. Now, why did you conceive there was no conflict between their interests? I ask that question for the purpose of determining the motives prompting these proceedings, and the course of the conduct of them, as to whether there was any fraudulent purpose connected with it.

A. Well, there certainly was not, on my part, nor none that I even suspected on the part of Mr. Tull; I am satisfied from what I knew then and now, that there was none. The reason why I conceived there was no conflict was this: The children took Mrs. Tull's place in the property; their interest was an undivided one-half, and so was Mr. Tull's; their interests were identical; Mr. Tull had no money to go on with the building; neither had the children. Owing to what I conceived to be the power of a guardian under the law as it then was, I don't know what it is now, it was not within the power of a guardian, even with permission of the probate court, to make a mortgage; a mortgage had to be made after title passed into Mr. Tull. Mr. Tull was willing that the property should be sold in advance, testifying before the probate court that he would bid what its fair valuation was. Its fair valuation was established before the probate court by disinterested testimony, and I don't remember what it was, but I know that I considered at the time it was the fair value of the property, and I conceived, therefore, that there was no contest or conflict in his interests, and that of the children.

Q.  Was that valuation the price actually paid or bid at the sale?

A.  Yes.

Q.  Was it, at that time, explained and made known to the court what was the character of the proceedings, and for what purpose they were inaugurated or instituted, and how they were to be carried into effect?

A.  The probate court fully understood the situation from first to last, and the means and the end in view; absolutely nothing concealed from him; the fullest explanation was made to him; the petitions themselves are a pretty full explanation of the situation and the purpose, and it was further explained to him, the further steps of it were explained to him by testimony, and by a statement of counsel; they were not incorporated into the record, because they had no place there; there was the testimony which was not preserved, the evidence upon which the court acted.

Q.  Was the money actually paid by Mr. Tull, at this time, and the time of this purchase?

A.  Personally I do not know; I mean, I do not know in the sense that I either saw it paid or know of my own knowledge, except what was told that it was not paid; but I do know, so far as I can know a thing of that sort, that it was not.

Q.  You understood that fact in the prosecution of these proceedings?

A.  Yes, sir.

Q.  What was the arrangement that was made in respect of that?

A.  The advice which I gave Mr. Tull and the guardian, and the explanation which I made of it to the probate court, was that Mr. Tull was perfectly good; if he was not, the bond of the guardian, Mr. P. D. Tull, was perfectly good for that money, until the first mortgage should go on and a second mortgage then be placed on to secure that money, and that course was taken with the knowledge and consent of Mr. Tull, the guardian, Mr. Kinnaird and the court (Judge Hartson being the probate court), and the second mortgage was subsequently put

on. The property by everybody was considered of very much more value than both mortgages; the second mortgage at that time being considered very good security.

Q. It was explained to the court that the mortgage to be given was to be a second mortgage, but was to cover the entire estate?

A. Yes, sir; the court understood that perfectly; I am told by Mr. Happy that the record don't show it was to be a second mortgage.

Mr. Hughes: I think the record is silent upon that.

The Witness: I can't understand that, because it was thoroughly understood by the court and all of the parties, that it was to be first. The petition on its face says that. the object of this was to give a first mortgage to your client —no other object in these proceedings.

Q. The same was true of the second petition and sale, and the subsequent mortgage taken in pursuance of it, was it? The second petition was after the fire, after the buildings were all burned down?

A. My recollection fails me when I come to that second proceeding; I don't remember much about it. I remember there was a second proceeding; and I see a. petition for it, or what is stated to be the petition for it, is in my handwriting, and that is about all I remember of it. Perhaps, if my attention was called to the details, I might recall.

Q. The second petition asks the court on similar grounds to direct sale of the remaining property?

A. I don't want to speak about that until I read the petition, with your permission.

Mr. Hughes. Yes, I would like to have you read the petition.

The Witness. (Examining petition.) This is a different piece of property from the first, isn't it?

Q. Yes, the first is a part of the property bought of Glover, and this was the balance of it when he was making the larger building, the building after the fire.

A. I can't recall much about the second proceeding than what appears on the petition now. My attention had not been previously called to it.

Q. Your best recollection would be that the same course was pursued in respect to it?

A. I should presume so, yes; but I can't remember whether the——

Q. (Interrupting.) I will ask you whether there was anything concealed from the court regarding this petition, either with respect to what was to be done——

A. (Interrupting.) Well, I can answer that very fully, that there was not; at least, if I put it through, there was not.

Q. That is in your handwriting?

A. This is in my handwriting, and, if I put it through, there was nothing concealed, I warrant that; I was not engaged in any fraud on any minors, nor to the court, I will tell you that, and I did not think that Mr. Tull was, and don't think he was yet.

### RE-DIRECT EXAMINATION.

Q. The facts that are here set forth in that petition, Mr. Graves, however, you got entirely from Mr. F. M. Tull, is that not a fact?

A. In this second petition?

Q. No, in the petition you relied upon him for the facts contained therein.

A. Why, in the main, yes.

Q. Mr. P. D. Tull had very little to do with the proceeding, as a matter of fact?

A. That is my recollection of it; after he was appointed guardian Mr. P. D. Tull used to consult me and was very solicitous, but I don't know—he said he didn't want to get into any trouble with it, and did not want to do anything but what was right. He came up and talked with me about it several times—I don't remember —I don't think that he knew at first hand the facts. On the hearing before the probate court we examined a number of witnesses to establish the facts alleged in the— that is, the first one. I remember distinctly about the hearing, remember where the office of the court was, and could recall, I think, some of the witnesses who were examined.

Q.   The witnesses were all produced by Mr. Tull, however, were they not?

A.   I expect that Mr. Tull got the evidence for me.  I am sure I did not go out on the street and rustle it up. Somebody did it, and I expect it was Mr. Tull.

Q.   You were paid for your services and employed by Mr. F. M. Tull, were you not?

A.   I was employed by Mr. F. M. Tull, and my present recollection is that Mr. F. M. Tull paid me, but from what source he got the money I don't know.  When I say he paid me, I would not be understood as meaning thereby whose money it was; my present recollection is that Mr. Tull gave me a check or something.  I know he paid me anyhow, but don't know whose money it was he paid me with.

### RE-CROSS EXAMINATION.

Q.   Do I understand you to say, Mr. Graves, that the facts presented to you at that time were obtained entirely from Mr. Tull, or were they within your knowledge?

A.   A great many of them were within my knowledge. I knew where the property was; I knew what the property was worth—that is, approximately; I knew that Mr. Tull was building; I knew that from Judge Kinnaird about the negotiations with the loan society; I knew of Mrs. Tull's death; I knew the things were hung up in mid-air, awaiting the getting of this money.

Q.   Did you know the witnesses that were examined before the probate judge?

A.   Oh, and so did he.  Spokane was a small town then; everybody knew everybody else.  I want to say, with the permission of counsel, I don't think I had anything to do with this second proceeding, except drawing this second petition.  Did I, Mr. Nash?

Mr. Nash: No, sir; I think that is where your work in the case ended—with the drafting of the petition.

The Witness: I have no recollection of what took place in the beginning, or anything else in this second petition. In view of some comments I have heard made by counsel here, I want to make my position there, with the permis-

sion of the court, clear—state it a little more clearly. It was this; that the property belonging to both Mr. Tull and Mrs. Tull, in her lifetime, after her death and her interest going to the children, it could be made available only by putting a mortgage upon it to complete that building, either to this company or some other company. The only (way) that it could be done under the law, as I held, and Mr. Kinnaird agreed with me, was by the sale of the property; the guardian could not mortgage.

Q. (By Mr. Hughes): You mean a probate sale?

A. A probate sale. Mr. Tull desired that a guardian should be appointed with authority to join in the mortgage. That could not be done under the law as it then stood. I don't know whether it could be done now or not. Therefore a probate sale was ordered at a fair price for the property. The children took a second mortgage as representing their interests, thus holding it subject to the mortgage to the German Savings & Loan Society; and Mr. Tull took the property subject to the second mortgage. The arrangement was considered by all parties advantageous, and if it had not been for the administration of Cleveland and some things like that—some things that subsequently followed—it would have been advantageous."

P. D. Tull, the guardian, testified in part, as to his connection with the probate proceedings, as follows:

"Q. Who employed Mr. Graves, or his firm, to conduct that proceeding for you?

A. I don't know who employed them; I did not.

Q. You did not?

A. I did not, sir; no, sir.

Q. Who paid him for it?

A. That I don't know.

Q. Then, of course, you did not?

A. No, sir; I did not.

Q. Now, then, about the same time and soon after you were appointed guardian, what, if anything, did you do, or was done in your name, in reference to selling real estate?

A.  I believe the property was sold; that is my recollection of it.

Q.  Do you remember, or do you not, whether a proceeding in the probate court was had to secure a sale of a part of that property?

A.  I think it was; yes, sir.

Q.  What was that, with reference to the time of your appointment?

A.  I think that was after the time I was appointed; just the time I don't know.

Q.  Now, there was a sale under that?

A.  Yes, sir.

Q.  Who were the attorneys in that proceeding on your behalf?

A.  I think Judge Houghton was the attorney, if I remember rightly.

Q.  I am speaking of the first proceeding, Mr. Tull. It was Houghton, Graves & Jones, was it not, the firm?

A.  I think that is the firm name. I know Houghton was connected with the firm.

Q.  Do you remember the occasion of the sale?

A.  I remember the sale being made.

Q.  Where was the sale made?

A.  On the grounds there, at the corner of Riverside and Stevens.

Q.  Who was present at the sale?

A.  I remember that—I don't remember any one except Judge Houghton, myself, and my brother, I think, were present.

Q.  How was the sale conducted?

A.  At auction.

Q.  Offered at the highest price?

A.  Yes, sir.

Q.  Who were the bidders?

A.  F. M. Tull.

Q.  What amount did he bid for the property?

A.  My recollection is it was $20,000; I am not positive as to that.

Q.  You remember that there were two sales, don't you, Mr. Tull?

A.   I remember very distinctly the first sale.   The second sale I don't remember what time, nor where it occurred.

Q.   You don't remember the amount that was paid?

A.   My recollection is it was $20,000; I would not be positive.

Q.   By Mr. Happy:   You are speaking of the first sale now?

A.   Yes, sir.

Q.   How was the purchase price to be paid?

A.   In a mortgage, I believe; paid in a mortgage.

Q.   What was the announcement made?   What were the terms announced?

A.   Cash.

Q.   Was there any cash paid to you at that time?

A.   No, sir.

Q.   Do you remember when that was?

A.   What year?

Q.   Yes.

A.   No; I think it was in 1889; that is my impression.

Q.   Was there ever any money paid to you at any time on account of that sale?

A.   There never was; no, sir.

Q.   What, if any, security did you take for it?

A.   I had a mortgage; I believe there was a mortgage given me.

Q.   A mortgage given you?

A.   I believe there was.

Q.   Do you remember when that mortgage was given?

A.   About the time, or shortly after the time, a sale was made.

Q.   How long after?

A.   I don't have any recollection.   I should judge it was very soon afterwards.

Q.   Did you afterwards execute a release of that mortgage?

A.   I think so.

Q.   (Handing witness paper.)   I show you plaintiffs' Ex. No. 18.   Is that a mortgage taken by you on the first sale?

A.    Yes, sir.

Q.    This was taken by you at the time it bears date, was it not?

A.    Yes, sir; I think it was.

Q.    This is the first mortgage.   Do you remember when you executed a release of it?

A.    No, sir; not the date.

Q.    At the time that you executed the release, was there any money paid to you on account of it?

A.    There was not.

Q.    Or to anybody for you, that you know of?

A.    No, sir.

Q.    What, if any, money was ever paid you by F. M. Tull, or by any one for him, upon account of the purchase price of the first sale of real estate?

A.    None.

Q.    Do you remember the property which you sold at that time distinctly, so you can tell what it was?

A.    Not the boundaries of it.   I know where it was situated, on the corner of Riverside and Stevens; but the boundaries I don't know.

Q.    Do you know whether or not all the property which your brother owned in that block at that time was sold at that time?

A.    No, sir; not positively, I do not.

Q.    Only a part of it?

A.    My impression is it was only a part of it.

Q.    State whether or not you afterwards made an application to the court to sell the remainder of the property, or there was a proceeding made?

A.    I suppose if there was such a proceeding on record, that I did; but I have no recollection of it.

Q.    You have no recollection of it?

A.    No, sir.

Q.    Do you know what attorney or firm of attorneys conducted that proceeding?

A.    I do not; no, sir.

Q.    Do you remember making a sale in another proceeding?

A. No, sir; I don't remember. I remember posting the first sale, but the second sale I don't remember at all the circumstances attending it.

Q. You were all the time acting as guardian for those children?

A. I suppose so.

Q. You were their general guardian?

A. I suppose so.

Q. If you made a second sale, did you ever, at any time, receive any part of the purchase price in cash?

A. I know I never received any money of any kind at any time.

Q. At any time?

A. No, sir.

Q. On account of your guardianship?

A. No, sir.

Q. Did you or did you not know about the various defects in these proceedings as they were taken—what was being done?

A. I knew very little about it.

Q. Who directed these proceedings on behalf of the children mostly?

A. Why, F. M. Tull.

Q. In fact, Mr. Tull, what, if anything, did you do, or what, if any, direction did you exercise over these proceedings, and over the sale of this real estate?

A. I did not do anything, only as directed by F. M. Tull.

Q. Then, Mr. Tull, as a matter of fact, you don't remember very much about it?

A. That is right, very little about it, sir.

Q. Who beside yourself, so far as you know, and F. M. Tull, exercised any authority or direction over the matter?

A. No one, to my knowledge.

Q. (Handing witness paper.) Look at that paper and see what it is. Did you ever see that before?

A. It looks very much like a note that I had at one time, or a copy of it.

Q. By Mr. Happy: A note that you had at one time?

A. Yes.

Q. By Mr. Murray (resumed): Where is the original of that, do you know?

A. I think I have got the original; I am not certain.

Q. You think you have it?

A. Yes, sir; I think I have it; I don't know whether it is the original of that or not. I have a note here of some kind.

Q. If you have, pass it up and let me see it.

A. (Handing counsel paper.) This is the original, I think.

Q. This is the original note?

A. Yes, sir; I think it is.

Q. Has that been in your possession for some time?

A. Yes, ever since.

Q. What is it? What was it given for?

A. My understanding is it was a mortgage note. That is the note, and there was a mortgage for $34,000 with the note.

Q. A mortgage for $34,000 with the note?

A. Yes, sir; that is the note.

Q. Do you remember executing a release of that mortgage?

A. No, I don't remember.

Q. You don't remember whether you did or not?

A. No, sir; I do not.

Q. Did you ever receive any money on that note and the mortgage covering it?

A. Never did; no, sir.

Q. At no time?

A. At no time.

Q. If you did release it, then, at all, state whether or not it was for any consideration; the release was given as coming to you on behalf of the minors?

A. No consideration.

Q. Mr. Tull, what, if any, accounting did you ever make of your guardianship?

A. I never made any.

Q.   Mr. Tull, what attention, if any, did you pay to any of these proceedings to sell real estate in the probate court?

A.   I paid none.

Q.   You paid none?

A.   Very little, if any.

Q.   Did you at any time ever employ or pay the attorneys who conducted it?

A.   I did not; no, sir.

Q.   What, if anything, did you do, aside from the sale of this real estate, in the matter of the guardianship over these children?

A.   Nothing that I have any recollection of now.

Q.   What, if anything, did you ever do in reference to the care of their person as distinguished from their property?

A.   Nothing.

Q.   What, if any, estate ever came to your hands on that account?

A.   How is that?

Q.   What, if any, money or property ever came to your hands on their account?

A.   Nothing, aside from this mortgage."

The property in the first sale, in May, 1888, was valued by Goldsmith at $50,000, and, exclusive of the improvements made and in course of construction, at $20,000. Property kept increasing in value, and in August, 1889, the same property, exclusive of improvements, was valued by Mr. Goldsmith at $100,000. The value in the fall of 1888, placed upon the property by witnesses for appellants, was $75,000. Witnesses for the respondent place a value of not less than $50,000 and as high as $57,500. The property in the second sale was of the value, according to the testimony, of not less than $60,000. No letters of administration on the estate of Lucy A. Tull were ever taken out or applied for. Mr. Cutter and Mr. Kinnaird, referred to in the testimony, were both dead when the same was taken.

The deeds from the guardian to F. M. Tull refer to the orders of the court under which the sales were made, and make the same a part of the deeds by such references.

The respondent claims that the complaint in this action is to foreclose the mortgages therein mentioned, and that the probate proceedings by which title to one-half of the property in controversy passed from the minor heirs to F. M. Tull, under whom respondent claims, cannot be questioned, because the same would be a collateral attack. The complaint in apt and specific allegations attacks directly the probate proceedings and the guardian deeds thereunder. On these allegations issues were joined by the respondent. It is true that the plaintiffs pray for a foreclosure of the mortgages, but they also pray for relief generally. Under the old chancery practice it has been held that the true character of a bill must be determined by the material averments; and if it appears therefrom that the plaintiff is entitled to relief, and the prayer will admit of that relief being given to which the plaintiff shows himself to be entitled, the court will grant such relief, even if the bill be given a wrong name. *McConnel v. Gibson,* 12 Ill. 128. Under a general prayer in a bill for a specific performance, held that rents and profits might be granted; any relief may be given for which the basis is laid in the bill. *Watts v. Waddle,* 6 Pet. 389. Where the plaintiff shows that he is entitled to some relief, such relief will be given as the case made out in equity demands, and as is consistent therewith. *Danforth v. Smith,* 23 Vt. 247; *Driver v. Fortner,* 5 Port. (Ala.) 9. Although the special relief asked may not be allowed, yet the court will, if possible, grant such relief as the allegations will support, in order to meet the demands of justice between the parties; so, where a bill asking for an assignment of a mortgage was not allowed, yet the court, upon certain averments in

the bill, sustained it as a bill to redeem. *Lamson v. Drake,* 105 Mass. 564. Although the prayer for special relief may be defective, relief will be granted under the general prayer, consistent with the equities of the case. *Treadwell v. Brown,* 44 N. H. 551; *May v. Lewis,* 22 Ala. 646; *Strange v. Watson,* 11 Ala. 324; *Townshend v. Duncan,* 2 Bland, 45; *McMillan v. James,* 105 Ill. 194. It was held in *Owings' Case,* 1 Bland, 370, that it is not essentially necessary that relief should be granted exactly or in part as prayed in the bill, but that affirmative relief might be granted upon the equities of the case as made out from the pleadings and proofs between the parties. *Johnson v. Johnson,* 1 Munf. 549, note; *Charitable Corporation v. Sutton,* 2 Atk. 406; *Walker v. Preswick,* 2 Ves. 622; *Taylor v. Ficklin,* 5 Munf. 25; *McNeil v. Baird,* 6 Munf. 316; *Fife v. Clayton,* 13 Ves. Jr. 546; *Higginson v. Clowes,* 15 Ves. Jr. 516; *Dorsey v. Campbell,* 1 Bland, 356; *Harding v. Handy,* 11 Wheat. 103; *Stuart v. Mechanics', etc., Bank,* 19 Johns. 496. It has been held, however, that under general prayer relief may be granted adapted to the case made by the bill, although it be inconsistent with the special prayer. *Eureka Marble Co. v. Windsor Mfg. Co.,* 47 Vt. 430; *Dews v. Cornish,* 20 Ark. 332. Our practice under the Code has not restricted, modified, or attempted to abridge the liberality of the old proceedings in granting relief of any and all kinds warranted by the pleadings and proof. The decisions of this court, in harmony with the provisions of our Code of Practice, establish the rule that if the plaintiff sets forth facts constituting a cause of action, notwithstanding he has misconceived his remedy, he is entitled to the relief the facts warrant. *Jackson v. Tatebo,* 3 Wash. 456 (28 Pac. 916); *Carl v. West Aberdeen Land, etc., Co.,* 13 Wash. 616 (43 Pac. 890); *Da-*

*mon v. Leque,* 14 Wash. 253 (44 Pac. 261, 61 Am. St. Rep. 927); *Watson v. Glover,* 21 Wash. 677 (59 Pac. 516). The complaint is drawn with a double aspect, and will justify a decree restoring the mortgages wrongfully canceled, and their foreclosure, or a decree adjudging the guardian's sales and deeds void and giving to the children an unincumbered one-half interest in the property. We do not think that by presenting their cause of action in this way the plaintiffs have definitely adopted one or the other remedy, and hence cannot be said to have waived the fraud in the guardianship sales, as contended for by the respondent.

The respondent further claims that, under §6474, Bal. Code, the guardian's sales set out in the complaint, and the deeds made in pursuance thereof, are cured as against all the grounds of the complaint urged by the plaintiffs. This section reads:

"In case of an action relating to any estate sold by an executor, administrator, or guardian, in which an heir or person claiming under the deceased, or in which the ward or any person claiming under him, shall contest the validity of the sale, it shall not be voided on account of any irregularity in the proceedings:  Provided it appears,—

1. That the executor, administrator, or guardian was ordered to make the sale by the probate or superior court having jurisdiction of the estate;

2. That he gave a bond which was approved by the probate or superior judge, in case a bond was required upon granting the order;

3. That he gave notice of the time and place of sale, as in the order and by law prescribed; and

4. That the premises were sold accordingly, by public auction, and the sale confirmed by the court, and that they are held by one who purchased them in good faith."

It will be observed that this section applies only when the lands are held by "one who purchased them in good faith." One who participated in the fraud, as charged in the complaint in this action, or who knew, or had the means of ascertaining by the exercise of common prudence, that a fraud had been perpetrated in the sale of the property, is not a purchaser in good faith. Want of notice or of the means of knowing is an essential element of good faith. As expressed therein, this section should be construed as applying to mere "irregularities" in the proceedings where the good faith of the probate proceedings is not impeached, but it cannot be held to apply where those proceedings are assailed on the ground of fraud from their very inception.

The respondent claims that, by operation of the decree of divorce under the laws of Kansas, which decree was obtained in the suit of F. M. Tull against Lucy A. Tull, the wife and those claiming under her are barred of any claim in or to the property of the husband, and that the property in controversy was purchased with money of the husband, owned by him at the time of such divorce. To sustain this defense it has introduced in evidence certain laws of Kansas, together with a record of said divorce proceedings, authenticated as required by the laws of the United States. It is provided by the laws of Kansas that:

"A divorce granted at the instance of one party shall operate as a dissolution of the marriage contract of both and shall be a bar to any claim of the party for whose fault it was granted in or to the property of the other."

The appellants, however, claim that this divorce was void because the court in Kansas had no jurisdiction to grant the same. We have held in the case of *Trowbridge*

*v. Spinning,* decided August 25, 1900, *ante,* p. 48, that, as to the question of jurisdiction arising under the constitution of the United States, which provides that "full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state," we will take judicial notice of the laws conferring jurisdiction on the courts from which such records come, when such records and judicial proceedings are sought to be given effect in this state. The laws of Kansas, when the complaint in the said action for divorce was filed, required that the plaintiff must have been an actual resident in good faith of the state for one year next preceding the filing of the complaint, and be a resident of the county in which the action is brought at the time the complaint is filed. The supreme court of Kansas has decided that the words "resident" and "actual resident," as used in this statute, contemplate a residence and actual residence with substantially the same attributes as are intended when the word "domicile" is used. *Carpenter v. Carpenter,* 30 Kan. 717 (46 Am. Rep. 108, 2 Pac. 122).

"The difficulty of defining accurately the term 'domicile' is generally conceded by both the courts and the text writers. The following definition, framed by an eminent authority, has, however, been frequently approved, and is probably the best that can be given. 'In a strict and legal sense, that is properly the domicile of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'" 10 Am. & Eng. Enc. Law (2d ed.), 7, and cases cited.

And in note, Kent's definition:

"The place where a man carries on his established business or professional occupation, and has a home and permanent residence, is his domicile." 2 Kent, Commentaries, 431.

And in note:

"The Roman codes describe domicile as follows: 'In whatever place an individual has set up his household gods and made the chief seat of his affairs and interests; from which, without some special avocation, he has no intention of departing; from which, when he has departed, he is considered to be from home; and to which, when he has returned, he is considered to have returned home —in this place there is no doubt whatever he has his domicile.' " *White v. Brown,* 1 Wall. Jr. 262.

Ordinarily, the authority of an attorney to appear for the party whom he professes by the record to represent is presumed, but such presumption may be overcome by any evidence extrinsic as well as intrinsic. On the 25th day of February, 1887, Frank M. Tull filed in the district court of Kingman county, Kansas, a petition for a divorce from his wife, Lucy A Tull. The plaintiff alleges his marriage to have been on the 3d day of March, 1872, *at the residence of the defendant's parents in Harrison county, Missouri;* and alleged also "that the plaintiff *now is* and has been a resident of Kingman county and the state of Kansas for the period of eight years immediately preceding the commencement of this action." He also alleges the issue of the marriage to be three children, William L., aged 13, Dora M., aged 9, Benjamin, aged 4. He also alleges that at various places and on numerous and divers occasions the defendant had committed adultery with many persons whose true names were unknown, and that particularly on or about the —— day of September, 1884, at the city of Kingman, in the state of Kansas, in the dwelling of the plaintiff, the defendant did commit adultery with one Richard Roe, whose true name is unknown, and that all such acts of adultery were without his consent, etc., and that he had not voluntarily cohabited with the defendant since he had

known of the commission of the acts complained of.
With the record is a praecipe, dated February 25,
1887, entitled in the case, directing the clerk of
the court to issue summons in the action for said de-
fendant, directed *to the sheriff of Harrison county, Mis-
souri*. In the record also is an alias summons from the
state of Kansas to the sheriff of Sacramento county, state
of California, commanding him to notify Lucy A. Tull
that she had been sued by Frank M. Tull in an action for
divorce in the district court within and for the county of
Kingman, Kansas, and that unless she answered by the
10th day of June, 1887, the petition of the said plaintiff,
against her filed in the office of the clerk of said court,
said petition would be taken as true and judgment render-
ed accordingly. This writ is tested March 23, 1887.
Upon this writ is a return as follows:

"State of California, County of Sacramento, ss.

Received this writ this 2d day of April, 1887, at 9:30
o'clock a. m., and as commanded by this writ, I summoned
the within named Lucy A. Tull on the 2d day of April,
1887, by delivering to her a certified copy of the within
summons and of the indorsements thereon; and I summon-
ed the within named Lucy A. Tull as above stated on the
2d day of April, 1887, at the city of Sacramento, state
of California, in my county. Dated Sacramento, Cal.,
April 2, 1887. M. M. Drew, Sheriff of Sacramento Coun-
ty, State of California."

The record further shows that on April 19, 1887, what
purported to be an answer in the case, in the words fol-
lowing, omitting the title, was filed:

"Now comes the above named defendant and for ans-
wer unto said plaintiff's petition herein filed says: She
denies each and every allegation in said petition contained.
Lucy A. Tull, by J. W. Hughes, her attorney."

The decree in the cause, as shown by the record, omit-
ting the title, is as follows:

"Now on this 9th day of May, A. D. 1887, the same being a day of the regular May term of said court, this cause coming on for trial and final decree, and it appearing to the court now here that said defendant has been *personally* served with the process of this court in this cause, and the said defendant having appeared and answered herein, and now at this time the court having heard the testimony of the witnesses herein, considered the same, it is found by the court that the said defendant, Lucy A. Tull, has been guilty of the several acts of adultery in plaintiff's petition charged. It is therefore considered, ordered, and adjudged and decreed by the court now here that the bonds of matrimony existing between the complainant and the defendant be dissolved and annulled and for naught held, and that each of said parties be henceforth free to marry again as if said marriage relation had never existed between said parties."

We have set out all this divorce record except a praecipe for two witnesses on behalf of the plaintiff—Isaac Tull and wife. The law of Kansas, pleaded by the respondent and introduced in evidence by it, provides for service by publication in divorce proceedings, and that in cases where service may be made by publication service of the summons may be made out of the state by the sheriff of the county in which such service is made, and that such service *may be proved by the affidavit of the person making the same* before certain officers named in the statute, and when service is thus made *and proved* it shall have the same effect as service obtained by publication and no other or greater force and effect. (See statute set out in the statement of the issues:) The proof in this case is that, on March 2, 1871, F. M. Tull and Lucy A. Tull intermarried in Missouri; that from the time of this marriage until F. M. Tull removed to Spokane Falls they lived in Missouri and Kansas; that F. M. Tull first came to Spokane Falls December 24, 1886, and on the 28th of December, 1886, made a contract to purchase

the property in controversy in this action; that, prior to coming to Spokane Falls, F. M. Tull had sold out his business and real estate in Kansas with a view to hunting a location elsewhere. F. M. Tull testifies:

"I sold out my business and started out to hunt a new location. I went to Southern California, and up to San Francisco, and around Seattle and Tacoma and Portland, and landed here and bought—made this purchase and located here [Spokane Falls]."

Question: What was your purpose, when you purchased property here in Spokane, as to making this your place of residence?

Answer: I decided to locate here, and came back here as soon as I could get here."

The first time F. M. Tull was in Spokane he contracted for brick with which to erect the house that he afterwards erected on the property he had contracted to purchase. He went back to Kansas, after contracting for the property and building, to wind up his affairs there, with the intention of coming back to Spokane as soon as he could get there; he came back to Spokane and was there two or three times in the early part of the year. He says:

"I came here, I think in March [1887], and then went away again, and then came back and went East again. I think I was here [Spokane Falls] at least two or three times that spring before I was ready to go ahead with the building, on account of brick—waiting for the brick to be burned."

He testified on cross-examination that he lived in Kansas about ten years before coming to this state, the last few years in Kingman, and that he was in the furniture business; that he commenced to build on the property in controversy about the first of June, 1887, and opened up the furniture business in that building the first of August, 1887; that after his December trip, in 1886, to

Spokane, he thinks he was next there in April, 1887; that he stopped at a hotel; that he did not bring his family with him; that he stayed two or three weeks, went away, and returned some time in May, the last time to stay, and on the first of July went East to buy his stock. In rebuttal, after respondent had introduced in evidence the record of the divorce in Kansas, F. M. Tull, called for appellants, testified that his wife left Kansas in January, 1887; that she went from Kansas to Missouri, to her father's; that his wife went to California some time in the spring of 1887; that she came to Spokane Falls in July, 1887; and that the last of July or first of August, 1887, in Spokane Falls, he remarried her. In connection with this evidence the plaintiffs offered in evidence from the files of the court a complaint in the suit of Lucy A. Tull v. Francis M. Tull, filed on the 28th of July, 1887, a summons issued upon it, and a praecipe and stipulation to dismiss. The respondent objected to their introduction, for the reason that they were papers in a controversy between parties not parties to this action, and that they were mere declarations, not made or taken in form of testimony, and were secondary evidence of any fact that might be material in this controversy. The court sustained the objection, but permitted the papers to be marked for identification, and they are brought up with the record. An exception was saved to the ruling of the court in excluding this testimony. An examination of the complaint offered shows it to be a suit in equity, brought by the wife against the husband on the 28th day of July, 1887, in the territorial district court holding terms at Spokane Falls, among other things, to set aside on the grounds of fraud the decree of divorce granted in Kansas, alleging want of service on her, and no knowledge of such divorce, and charging facts which, if true,

would have entitled her to the relief prayed for. We have set out more fully the substance of this complaint in the statement. The summons issued under the practice then in force set forth the cause and general nature of the action, and appears therefrom to have been served on the husband on the 28th day of July, 1887, at Spokane Falls. The stipulation is dated the 30th day of July, 1887, purports to be signed by the husband and wife, and dismisses the action on the payment of costs. We think this evidence should have been received. Taken in connection with the conduct of the husband in remarrying the wife immediately on the filing of this complaint, it was a circumstance tending to show the fraudulent character of the divorce proceedings in Kansas. It is not to be presumed that a husband, after charging his wife with being, in effect, a common prostitute, and stating that he had just discovered that fact and for that reason was granted a divorce on May 9, 1887, would, when confronted by the wife with the charges contained in her complaint, remarry her within two days after the complaint was filed, unless he was anxious to prevent an investigation of the facts charged against him. The wife is dead. This is the best evidence attainable, under the circumstances, of her attitude in relation to the Kansas divorce. These declarations were made long before the cause for action arose, and when there could have been no anticipation of this action, and under certainty of exposure if they were untrue. These, to be sure, are mere declarations, but they are in the nature of *res gestae,* and were, in effect, made by the wife to the husband, and he acted thereon, when she first discovered the fact that a decree of divorce had been obtained by him, which she asserted was fraudulent, and they are contemporaneous with the main fact under consideration, and illustrate its character. Says Greenleaf:

"There are *other declarations* which are admitted as original evidence, being distinguished from hearsay by their connection with the principal fact under investigation. The affairs of men consist of a complication of circumstances so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstance, and, in its turn, becomes the prolific parent of others; and each, during its existence, has its inseparable attributes, and its kindred facts, materially affecting its character; and essential to be known in order to a right understanding of its nature. These surrounding circumstances, constituting parts of the *res gestae,* may always be shown to the jury, along with the principal fact; and their admissibility is determined by the judge, according to the degree of their relation to that fact, and in the exercise of his sound discretion; it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description. The principal points of attention are, whether the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration, and whether they were so connected with it as to illustrate its character." Greenleaf, Evidence (15th ed.), § 108.

Holding this view, and this being a trial *de novo,* we will consider these papers in evidence as a circumstance tending to show, with the other facts in the case, that the Kansas divorce was fraudulently obtained. There is intrinsic evidence of fraud in the divorce record, which overcomes the presumption that the wife appeared in that proceeding by attorney or otherwise, or that she had any notice of the suit. The summons required her to appear and answer by the 10th day of June, 1887. The decree bears date of May 9, 1887. It recites that she had been *personally* served with process. The record fails to show, as required by the law of Kansas, *proof* of any service of process whatever. The law of Kansas required that, when summons was served by a non-resident sheriff,

as in this case, such service should be proved by the affidavit of the person making the same before the clerk of a court of record, or other officer holding the seal thereof, or before a commissioner appointed by the governor of Kansas under the act providing for the appointment of commissioners to take depositions, etc. The only evidence of service of summons in this cause is the mere certificate of a person who says he is sheriff of Sacramento county, state of California. The recital in the decree that the defendant had appeared and answered, when examined in connection with that appearance and answer, tends to show that such appearance and answer were fraudulent. The pleadings of appellants and respondent in this action aver, and the proofs show, the marriage of the wife and the birth of her children. Yet her alleged answer in the divorce case is so general in terms that it denies her marriage to the plaintiff and the paternity of her children. The decree fails to recite any facts as to the residence of the husband, or whether the alleged adultery had been condoned, although these facts were alleged in the petition and were necessary allegations. It fails to award the custody of the children, although the husband prayed for their custody. The evidence shows that F. M. Tull was living with his wife and family up until her departure, in January, 1887, to her father's preparatory to her final journey to her new home on the Pacific slope. The complaint in the divorce case alleges specific acts of adultery in 1884, and acts of adultery generally, but fails to allege when this was discovered by the husband— before or after the departure of his wife from Kansas. On the day the complaint was filed the first summons was issued to the sheriff of Harrison county, Missouri, but no service was made of this writ. The alias summons to the sheriff of Sacramento county, California, was made on

the 13th of April, 1887, at the time the testimony of the husband shows that he was in Spokane Falls. The home in Kansas had been broken up in January, 1887, with the intention of making a new home at Spokane, and active steps to set up such new home had been taken before the time of the filing of the divorce proceedings. Neither the husband nor the wife had his domicile in Kansas at the time that the divorce suit was commenced. It is a universal rule, so familiar that authorities need not be cited in support thereof, that, to give courts of any state jurisdiction over the marriage relation between a husband and his wife, one of the parties at least must have a domicile within that state. But the respondent claims that, inasmuch as the record shows the appearance of Lucy A. Tull by an attorney in the divorce suit in Kansas, it cannot now be collaterally questioned by her heirs in this suit, or the jurisdiction of the court disputed. This divorce record is pleaded and introduced in evidence, and effect is sought to be given to it here by virtue of § 1, art. 4, constitution of the United States, and the laws of congress, to give full credit to the records of sister states. The decision of the supreme court of the United States upon questions arising under this provision of the constitution and laws of congress, to give it effect, should be controlling upon the supreme court of this state. The supreme court of the United States, in *Thompson v. Whitman,* 18 Wall. 457, has decided against the contention of the respondent. In that case the court says:

"The main question in the cause is, whether the record produced by the defendant was conclusive of the jurisdictional facts therein contained. It stated, with due particularity, sufficient facts to give the justices jurisdiction under the law of New Jersey. Could that statement be questioned collaterally in another action brought in another state? If it could be, the ruling of the court was substantially correct. If not, there was error."

The judgment was affirmed. The syllabus is as follows; and is fully borne out by the text:

"Neither the constitutional provision, that full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state, nor the act of congress passed in pursuance thereof, prevents an inquiry into the jurisdiction of the court by which a judgment offered in evidence was rendered.

The record of a judgment rendered in another state may be contradicted as to the facts necessary to give the court jurisdiction; and if it be shown that such facts did not exist the record will be a nullity, notwithstanding it may recite that they did exist.

Want of jurisdiction may be shown either as to the subject-matter or the person, or, in proceedings *in rem*, as to the thing.

By a law of New Jersey non-residents were prohibited from raking clams and oysters in the waters of that state under penalty of forfeiture of the vessel employed; and any two justices of the county in which the seizure of the vessel should be made were authorized, on information given, to hear and determine the case: *Held,* that if the seizure was not made in the county where the prosecution took place, the justices of that county had no jurisdiction, and that this fact might be inquired into in an action for making such seizure brought in New York, notwithstanding the record of a conviction was produced which stated that the seizure was made within such county."

We think, from the extrinsic evidence in this case, and that intrinsically appearing in the record offered in evidence, that the Kansas court had no jurisdiction to enter the decree of divorce pleaded, that such decree is fraudulent and void, and no bar to the property rights of the wife, and that the marriage ceremony at Spokane was an empty form.

The husband, F. M. Tull, came to Spokane Falls in December, 1886, and contracted for the purchase of the

property in controversy in this action; and under such contract it was, in June and August, 1887, conveyed to him, and by him improved. When the husband was married, one hundred dollars would cover all his property, and the wife had no property. In some way,—the evidence does not disclose how,—the wife accumulated $300 in money and a farm in Missouri, which was sold for $1,000. While the husband, wife and children were living as a family in Kansas, the husband carried on the furniture business and accumulated in real estate and in his business property which he sold in the fall of 1886, and from which he realized, after settling up his business in Kansas, about $25,000. This money, with the wife's money and profits of his business in Spokane, was all invested in paying for the property in controversy and improving the same, deducting therefrom the living expenses of the family. The respondent claims that we are to presume that the common law prevailed in Kansas, and therefore that the money accumulated there was the separate property of the husband, and that the property here purchased and improved with that money is also the separate property of the husband. The appellants contend that, inasmuch as the territory embraced within the state of Kansas was a part of the Louisiana purchase, Kansas should, like Louisiana, be presumed to have inherited from the Spanish law the system of community property rights between spouses. The territory embraced within the present state of Kansas, when acquired under the Louisiana purchase, was not inhabited by a civilized people and no system of laws of European origin existed there; the laws existing in Kansas, when that purchase was made, were the tribal customs of savages; hence, we can not presume that, because Kansas was part of the Louisiana purchase, the community system existed there in

1887. People from all the states of the Union and from all parts of Europe settled in Kansas, and formed the civilized system of laws under which they live. We know from the history of our own state that a people may live at one time under one system and at another time under a different system. Why, then, should we presume that any particular system of laws regulating the property rights of married persons existed in Kansas in 1886-87? The only proof offered as to the laws of Kansas is not as to the status of property during the continuance or existence of the community, but as to the effect of a dissolution by death or divorce. In the absence of proof of the laws of another state in relation to the property rights of husband and wife as to property acquired there during marriage, it has been held that they will be presumed to be the same as those of the state where the proceeds of such property have been re-invested. *Marsters v. Lash,* 61 Cal. 622; *Shumway v. Leakey,* 67 Cal. 458 (8 Pac. 12); *Mortimer v. Marder,* 93 Cal. 172 (28 Pac. 814). This court has held that under the statutes of this state lands acquired after marriage by a deed of purchase expressing a money consideration are presumed to be community property, and the presumption can be rebutted only by clear and convincing proof that the consideration was furnished out of the grantee's separate property. *Yesler v. Hochstettler,* 4 Wash. 349 (30 Pac. 398). From the view we take of this case it is not necessary to further discuss the question of presumptions. But it seems, even from the laws introduced in evidence by respondent, that dower and curtesy are abolished in Kansas, and one-half of the real estate, after paying debts, on the death of one spouse passes to the other; thus showing that the common law is no longer in force there, in this respect at least; and,

if anything is to be presumed, these facts might warrant the presumption that Kansas had a system somewhat similar to our own.

The decisive question in this case is, whether the respondent took its mortgages upon the property in controversy in good faith, without knowing, or having the means of information by which it might, by the exercise of common prudence, have known, of the acts of the guardian and F. M. Tull in transferring the property from the minor children to F. M. Tull, and whether those acts were fraudulent. The respondent is a corporation engaged in loaning money, its principal place of business and home office being in San Francisco, California. It must transact its business through the hands of agents. At the very outset it becomes necessary to inquire touching the agents of the respondent who managed for it the various loans, and mortgages to secure the same, mentioned in the pleadings and evidence in this action. Mr. Tourney, who was connected with the respondent company for many years, and was its secretary, testifies that he supervised the business of the bank to a great extent in making loans, subject to the approval of the board of directors; that the board of directors passed upon the loans and applications; that the Tull applications for loans were received from Mr. B. Goldsmith, of Portland, Oregon; that Mr. Goldsmith was the statutory agent of the respondent corporation for Oregon and clothed with authority to accept, in that state, service of judicial process; that the respondent dealt with Mr. Goldsmith as a broker, as it would deal with other brokers; that Mr. Goldsmith had no other appointment from the respondent; that the board of directors of the respondent, in passing upon loans, placed reliance to some extent on the "reports" of Mr. Goldsmith; that it had confidence in

Mr. Goldsmith's judgment; that the president of the company, Mr. Gottig, had been in Spokane before any of the loans were made, and that he and Mr. Gottig had been here after the first loan was made; that on such trips "in visiting a city like Spokane, we would limit ourselves to a certain district, and establish in our minds certain values per front foot for certain blocks, and so we had a certain value for Riverside Avenue, between one block, and certain values for another, and these would be a sort of a guide, a check to us, when an application would be received with recommendations of values." He further stated that, on the 16th day of May, 1892, Messrs. Kinnaird & Happy were designated as the attorneys at Spokane, whose certificate of title the respondent would accept; that on all the loans prior to the $20,000 loan, Cox, Smith & Teal, or Milton W. Smith, successor of Cox, Smith & Teal, gave the certificates of title as to the property mortgaged, and that Milton W. Smith gave the certificate of title on which the respondent acted for the $100,000 mortgage, and Kinnaird (J. M.) and Happy gave the certificate of title for the $20,000 on which it acted; that the respondent had no knowledge of J. M. Kinnaird's connection with the prior mortgages or the probate proceedings, and the first intimation of that was when the interrogatories were propounded to the respondent in this action; that respondent never employed any one for any purpose in connection with the mortgages prior to May, 1892; then the firm of Kinnaird & Happy was designated to certify titles; that the respondent's officers did not have any actual knowledge that the property had gone through probate court and depended on a probate sale. He said the first loan was delayed after application, but that he did not know why, and he did not remember whether he knew of the death of Mrs.

Tull, or whether the respondent took any action on that account; that the only knowledge of title the respondent had was that it acted on the certificate of title given by Cox, Smith & Teal, or Mr. Smith, for all loans prior to the $20,000, and as to the $20,000 the certificate of title by Kinnaird & Happy was its only knowledge; that the four mortgages were drawn in the office of Cox, Smith & Teal, or Milton W. Smith, and the $20,000 mortgage by Kinnaird & Happy, all on blanks furnished by the respondent; that the money on these loans was paid over principally on drafts on the respondent from B. Goldsmith, drawn principally to the order of F. M. Tull and paid principally through the First National Bank of Spokane. The condition of all the loans was that all the expenses were to be paid by the borrower; that no reports as to value and condition of the property and improvements thereon, other than Mr. Goldsmith's, were ever required by the respondent. The witness also testified that the respondent had never heard of Horace L. Cutter, cashier of the First National Bank of Spokane, in connection with these loans, until the interrogatories were filed in this action; that the respondent had had some communication with Mr. Cutter, applying for other loans. Milton W. Smith, of Cox, Smith & Teal, testified that in 1886 or 1887, the members of his firm were appointed by the respondent agents or attorneys to examine titles for the respondent, and to certify as to the same, but they were never paid by the respondent any retainer or anything for their services; that such employment was special and they were designated as the attorneys to certify titles for respondent in Oregon particularly, and sometimes in Washington; that he succeeded his firm, on its dissolution, as examiner for respondent, in the same manner as his firm was employed; that no personal exam-

14—23 WASH.

ination of the records in Spokane county, in reference to titles on the Tull loans, was made, but reliance was placed wholly upon the abstract of title furnished; that B. Goldsmith employed him or his firm directly to examine the titles to all the Tull loans except the $20,000 loan; that Mr. Cox, of the firm, examined the title as to the first loan on the abstract furnished by B. Goldsmith. The first abstract purported to be made by D. M. Thompson, per B. N. Carrier, as examiner, at the request of J. M. Kinnaird. It remained in the possession of Mr. Smith until the next loan was to be passed upon. It was then handed to Mr. B. Goldsmith to be continued down to the date of the loan applied for. This was the method as to all the loans. The certificate of title, after examination, was given to Mr. B. Goldsmith to be forwarded to the respondent. Each time a loan was made, a new certificate of the abstractor was put upon the abstract. The first abstract was carried down in this way. These abstracts were never turned over or sent to the respondent at San Francisco, and the officers of the society never saw any abstract upon which Mr. Smith or his firm certified the title. The abstracts were all delivered to his firm or himself by Mr. B. Goldsmith. Neither Mr. Smith nor his firm had any correspondence or connection with the respondent in connection with these loans, further than examining the title at the instance of Mr. Goldsmith on an abstract furnished by him, giving the certificate of title to Mr. Goldsmith, which it was understood was for respondent, and receiving pay therefor from Mr. Goldsmith. Bernard Goldsmith testified that he had resided in Portland, Oregon, for thirty-eight years; that since 1880 he had been in the brokerage business; that the Tull loan was first brought to his attention by H. L. Cutter, cashier of the First National Bank of Spokane; that in May, 1888, witness was at Spokane and Cutter told him a customer of his bank wanted a loan of $40,000, for

which he was willing to pay eight per cent. interest, with commission of $1,200, and furnish an abstract; that, if witness could place the loan, they would divide the commission. Witness told Cutter that he would look at the property and see if it was such a loan as he could recommend; that he did look at the property and went back and told Cutter that he could recommend the loan. By an arrangement made by Mr. Cutter, he met F. M. Tull at the First National Bank building, talked over the loan, and the terms were agreed upon. Witness drew up application for the loan and Tull signed it. An agreement was drawn up by Goldsmith and signed by Tull, dated May 8, 1888, by which Tull appointed Goldsmith as his agent to procure the loan, and agreed to pay Goldsmith $1,200 for his services in procuring the loan, examining the property *and the title thereto,* and for making out the necessary papers, documents, and mortgage. This agreement described part of the property in controversy in this action upon which the loan was to be made, and also provided that the mortgage should be a *first* mortgage, the rate of interest should be eight per cent., and that the mortgage was to run three years, and that Tull should pay all taxes assessed against the property and against the mortgage. The witness further said that he mailed Tull's application, with witness's report upon it, to respondent, at San Francisco. Witness says it was suggested by Cutter or Tull, he did not know which, that it would be satisfactory if Kinnaird would attend to getting out the abstracts. Witness was not much acquainted with Kinnaird, but was satisfied, and told "him" that, when the respondent gave the witness notice. Witness instructed Mr. Cutter to go to work and get up the abstracts, or have them gotten up and sent to Cox, Smith & Teal, at Portland, Oregon. The mortgage was prepared by Cox, Smith & Teal, and handed to the witness, who forwarded it to Cutter to be executed

and placed on record. Between the time the mortgage left Spokane and the time it reached Portland, Mrs. Tull died. The witness says he did not know it, but happened to come to Spokane Falls a few days afterwards and Cutter informed him that Mrs. Tull had died, and wanted to know if some court proceedings would be required before a clear title could be established, and whether, if there was a delay, the loan could be finally consummated. Witness told Cutter that whenever they could present a title which the firm of Cox, Smith & Teal would certify to, he thought the loan could be consummated. The mortgage was prepared by Cox, Smith & Teal, and witness Goldsmith, after the mortgage was recorded, sent to Mr. Cutter a draft which the witness had drawn on respondent in favor of Tull, the money being paid in that way as the building progressed. The witness paid for examining the title, certificate of title, and drawing the mortgage out of his commissions. The applications for the other loans were made through Goldsmith, reports made by Goldsmith, abstracts examined, certificates of title given and paid for, as in the first loan, and, as Mr. Smith testifies, commissions were paid witness on all loans on the basis of the first loan, except that $500 was all the commission for the second loan. On cross-examination the witness said that nobody appointed him surveyor; that the blanks were gotten up by himself; that he made the survey at no one's request, but in presenting a loan to the respondent it was necessary to make some remarks about it. There was no understanding between him and the respondent that his recommendations should be considered good. He and Cutter were partners in the $1,200 commissions, and also in the commissions for the other loans. The mortgages, after their execution, were delivered to Cutter to put on record, and, after being recorded, they were delivered to Mr. Goldsmith. Witness says he never employed or paid

Mr. Kinnaird for any services rendered by him. F. M. Tull made written application signed by himself for each loan. Mr. Goldsmith sent in with each of these applications what purported to be a "surveyor's report," signed by himself. In a letter to the respondent's president, dated Portland, Oregon, May 14, 1888, Mr. Goldsmith says:

"During my recent visit at Spokane Falls the enclosed loan was offered. * * * I can strongly recommend the acceptance of the loan as being perfectly safe and good. The owner expects to pay off the loan, if made to him, from the profits of his business, as he is now making money at the rate of $15,000 per year."

His surveyor's report was as follows:

"The within is an application for a building loan.
I value the property without improvements at....$50,000
Improvements, when completed, not less than....  60,000
                                                 _____
    Total ....................................$110,000
My valuation and the owner's valuation of the lots is low. The owner has in fact been offered more for it. The property is well located, and the building is now nearly all engaged and will be occupied as soon as finished. The owner is now expending and will expend on the building $20,000 before he will require any money from us. The owner is a prosperous furniture and carpet dealer, and is worth, outside of his real estate, over and above all liabilities (he has hardly any), some forty thousand dollars, and expects to pay off this loan, if we make it, from the profits in his legitimate business. I can strongly recommend the acceptance of this loan as being perfectly safe and good. The town of Spokane is growing and improving wonderfully and it is a substantial city, with great prospects as to its future. Arrangements can be made with First National Bank of Spokane Falls to pay the money in the same manner as Goetz & Baers' money is paid to them. (Signed)                         B. Goldsmith."
    Portland, May 14th, 1888.

When the $50,000 loan is wanted, it is accompanied by a like "surveyor's report," in which he values land at $100,000 and proposed improvements at $75,000. He says in this report:

"* * * We have now a loan of forty thousand dollars on this property, which will be paid off by the insurance. * * * When the insurance of $40,000 is paid to us and the interest due, we better cancel the old mortgage and have new one made out for this loan, if accepted."

When the $10,000 loan is applied for, Mr. Goldsmith makes a "surveyor's report," puts a value on the property and improvements, and writes:

"The applicant will want ten thousand dollars when loan is completed and the balance of the loan as the building progresses. He first made application for a loan of twenty thousand dollars on the 60x80 feet lot on Sprague street, ten thousand of which to be put into the building on the lot, but as the amount of the loan exceeded the 40 per cent. limit and the valuation, I suggested to the applicant to give us a mortgage for the twenty thousand dollars, covering the property on which we have a mortgage for one hundred thousand dollars now and on the above mentioned 60x80 on Sprague street. This he is willing to do, and I recommend the acceptance of the loan on the above conditions.

"Portland, Or., April 14th, 1893."

On June 8, 1890, the respondent writes to Turner & Graves, attorneys at Spokane Falls, and appoints them attorneys for examination of titles at Spokane Falls, and in that letter says: "Blank notes and mortgages of this society have been sent to Mr. Cutter, and probably have already been handed to you." F. M. Tull says he first talked with Horace Cutter, cashier of First National Bank of Spokane, about the first loan early in the spring of 1888; that when Mr. Goldsmith was up looking over the property he signed the application on a blank furnished by Mr. Cutter or Mr. Goldsmith. After his wife died, he was

notified by Mr. Kinnaird or Mr. Cutter that he could not get the loan because he could not give title; that Mr. Cutter seemed to have charge. He was told that he would have to go through probate proceedings before the respondent would make the loan. This notification he presumes came from Mr. Cutter; that he did most of the dealing with Mr. Cutter after Mr. Goldsmith had been at Spokane. Cutter told him what to do, and directed this end of the corresponding and negotiations for the money. After this talk with Cutter, the probate proceedings occurred and witness employed as attorney to carry them through the firm of Houghton, Graves & Jones. This question was asked the witness:

"Q. Were you informed or directed by any person, acting or assuming to act on behalf of this corporation, as to who must be satisfied with this title,—to whom it must be referred to on their behalf?

A. Well, I was informed that they would not make the loan on the title that I could give at that time, and when I went into the probate proceedings I tried at all times to carry out their instructions of their agents here so as to make the title as they wanted it, because I wanted the money very bad. I had to have it. My building was partly under construction, and I was in great danger of losing it all if I could not get more money to complete it, and I was very anxious to make the loan."

"Q. Now, whose instruction did you act under in perfecting that title?

A. Mr. Kinnaird, he seemed to be the acting attorney here."

The court, on motion of respondent, struck out of this answer, "He seemed to be the acting attorney here;" to which plaintiff excepted. The following is part of this witness's examination:

"Q. Now, what, if anything, did Mr. Cutter say to you at any time pending this proceeding, in reference to the

proceeding, and to whom did he direct you in reference to it?

A. He directed me to Mr. Kinnaird for any legal questions in the proceedings.

Q. What, if anything, did you do then in reference to consulting Mr. Kinnaird about it?

A. I consulted Mr. Kinnaird a good deal all through that proceeding until I got the loan; handed the abstracts, papers, and such things to him. He seemed to be, so far as I know, acting as agent of the company. I did not know any one else at the time.

Q. As a matter of fact, state whether or not Mr. Kinnaird was informed from time to time by you, or by others in your presence, of the progress of that proceeding.

A. I talked with Mr. Kinnaird several times,—very often,—about this probate proceeding."

The $40,000 mortgage was delivered to Mr. Tull to execute by Mr. Cutter or Mr. Kinnaird, and when he executed it he delivered it to Mr. Cutter or Mr. Kinnaird. The testimony of Mr. Frank Graves, given in full in the opening statement, strongly tends to prove that Mr. Kinnaird and Mr. Cutter were both representatives of the respondent. J. M. Kinnaird either took the acknowledgment or witnessed all of the several mortgages given to the respondent.

From this evidence we conclude that B. Goldsmith was more than a mere broker for the borrower; he was the agent of the respondent in looking after the various loans made by it to Tull, and in doing all things usually done in connection with such matters, such as looking into the title of the property given as security, employing attorneys to investigate titles, investigating the value, and in paying over the money borrowed when satisfied with the security given; and there is no doubt in our minds that Mr. Cutter and Mr. Kinnaird, in all that they did, were acting with the full knowledge and consent of Mr. Goldsmith and under his directions generally. It is contrary to ordinary

experience in business affairs to presume that the respon-
dent would loan the amount of money involved without
having an agent to look after these matters. We must in-
dulge in this presumption, however, if Mr. Goldsmith was
not the agent of the respondent for the purposes indicated.

The facts in this case are somewhat similar to the facts
in the case of *Matteson v. Blackmer,* 46 Mich. 393 (9 N.
W. 445). In that case, as here, the claim was put for-
ward that the agent was agent for the borrower only. Judge
Cooley, in that case, says:

"In this transaction he claims to have been agent for
Mr. Blackmer in obtaining a loan for him; but giving full
effect to all his statements of fact, it is perfectly evident
he was agent for his father in this matter as much as at
other times. It may be that he was not under pay at the
time; but if so he performed a voluntary service of which
his father accepted the benefit. Milo took upon himself
the whole negotiation, decided upon the security, satisfied
himself respecting the title, attended to the execution of
the papers, received the money from his father and paid
it over to Blackmer; in short, did everything there was
for an agent to do in the matter, and as much as any agent
could ever have done in a similar negotiation. Complain-
ant never appeared in the transaction at all, except as he
handed over the money to Milo; and it is idle for Milo to
testify that under such circumstances he was agent for
Blackmer. It is true he succeeded in extorting from
Blackmer a large bonus; but that has been altogether too
common a procedure for the agents of money lenders to
have significance on this question."

So, in this case, Goldsmith reported upon the value of
the securities, fixed the terms of the loan subject to re-
spondent's approval, looked after the title, employed at-
torneys to examine the same, looked after the execution
and recording of the mortgages, received the money, and
paid it over to the borrower;—in fact, did everything
there was for an agent to do; and the respondent accepted

the benefit of his services, and, as the respondent loaned only to borrowers who paid all the expenses, the mere fact that Goldsmith exacted his pay by way of commissions from the borrower can have no significance. Was Goldsmith agent for the respondent? The fact that a reputable attorney like Mr. Kinnaird, who was afterwards judge of the superior court, and the attorney for the respondent when the $20,000 loan was negotiated, acted throughout the probate proceedings for respondent, after Goldsmith's attention had been called to the fact by Mr. Cutter that on Mrs. Tull's death probate proceedings were necessary, and Goldsmith said to Cutter that, if Cox, Smith & Teal would pass the title, that would be sufficient to obtain the loan; the fact that the abstract of title was gotten up at the request of Mr. Kinnaird; the fact that when the loan was first proposed Mr. Kinnaird was employed by Goldsmith and Cutter to look after getting out the abstract; the fact that Mr. Kinnaird was corresponding with Cox, Smith & Teal as to the title during the probate proceedings; and the fact that the mortgages were acknowledged before Mr. Kinnaird as a notary public, and were witnessed by him, and some of them recorded at his instance,—all strongly confirm our conclusion that Mr. Kinnaird was employed by Mr. Goldsmith to look after perfecting the title, so that Cox, Smith & Teal, who resided at Portland, Oregon, would give a certificate of title when the abstract was referred to them for examination. Mr. Kinnaird had full knowledge of the probate proceedings. The respondent is bound and affected by the knowledge and notice its agent had. *The Distilled Spirits,* 11 Wall. 356.

It cannot be said, then, to be a purchaser in good faith. But, conceding that it did not have actual knowledge that the probate proceedings were for the purposes shown in this case, it had actual knowledge of circumstances to put it on inquiry as to F. M. Tull's title to the children's half of the

property, and, by the exercise of reasonable diligence, could have obtained knowledge of all the circumstances under which the order of sale of the probate court was made and the title transferred.  The records in the auditor's office of Spokane county would have shown the guardian's deed to Tull, and that referred to the probate proceedings.  The abstract of title upon which Cox, Smith & Teal based their certificate of title must have contained a record of the probate proceedings; at least, it contained, or should have contained, the guardian's deed.  That deed showed that the title originally belonged to the children and had been sold by an order of the probate court.  An investigation of the probate records in that proceeding would have disclosed these facts:  That the natural guardian, the father, with whom the children were living, had joined in the petition requesting that their uncle be appointed their guardian; that the father was surety on the general bond of the guardian; that the father was surety on the bond required under the law when the first tract was sold, was surety on the bond of the guardian for the sale of the second tract, and was the purchaser of both tracts. These facts were sufficient to put a prudent man on inquiry.  The least investigation would have disclosed the matter as it has been disclosed to us by the testimony.

"Whatever is notice enough to excite the attention of a man of ordinary prudence and call for further inquiry is, in equity, notice of all facts to the knowledge of which an inquiry suggested by such notice, and prosecuted with due and reasonable diligence, would have led.  Kerr, Fraud and Mistake (Bump's ed), 236.

"It will not do for a purchaser to close his eyes to facts; facts which were open to his investigation, by the exercise of that diligence which the law imposes.  Such purchasers are not protected.  *  *  *  No principle is better established, than that a purchaser must look to every part of the title which is essential to its validity.

\* ⁘ \* When a purchaser cannot make out his title but through a deed which leads to a fact, he will be affected with notice of that fact." *Brush v. Ware.* 15 Pet. 93.

The proof is uncontradicted, and it is admitted by the respondent in its brief, that the probate proceedings were for the purpose of vesting title to the entire piece of property in the father, so that he might mortgage it to the respondent in order to get money to go on with the buildings in course of construction on part of the property, and that, in place of the children's interest being sold for cash, they were to get a mortgage, second and subordinate to the respondent's, for a sum the father was to go through the form of bidding, which had been agreed upon in advance by the probate court, on testimony taken as to the fair value of the children's interest. The testimony of P. D. Tull, the appointed guardian, shows that he was used as an instrument by the father to accomplish this end. He was in no sense of the word "guardian." He did just as he was directed to do by the father, and, it seems, with full knowledge of the probate court. The father was the actual guardian. The law as it existed at the time these alleged sales by the guardian were made authorized the probate court, when the estate was suffering waste, or a better investment of the value could be made, to sell the infant's interest in real estate. Here no *bona fide* sale in the open market to the highest bidder was contemplated. If we should uphold these transactions, the interest of infants in real property in this state would be under a very precarious tenure. It may be conceded that there was no intention—and we think that is a fact—on the part of the attorneys, the probate judge, Tull, and the respondent, to injure the appellants, and that they acted from the best of motives; but the fact stands out, nevertheless, that they perpetrated

in law a fraud upon the children. As was said by BLACK,. C. J., in *Nicholson's Appeal*, 20 Pa. St. 50:

"It matters little to an orphan child whether his interests are sacrificed and his prospects blighted by well-meaning ignorance or by willful malice. Either is within the definition of misconduct, a word which applies not to the motives but to the act."

In *Weinstock v. Levison*, 14 N. Y. Supp. 64, it was held that proceedings for the sale of an infant's interest in land, not instituted in good faith to sell such interest to a real purchaser, but to transfer the entire title, unincumbered by the infant's interest, to his father, are absolutely void, though full value was paid for the infant's interest, and no wrong in fact was intended. The court,. in that opinion, says:

"It makes no difference, in my opinion, that no fraud was intended; nor is it material, as was shown, that the infant received fair value of her interest in the property from the father. The facts still remain that the proceeding was not resorted to for the purpose of selling in good faith to a real purchaser the infant's property, but the alleged purchaser was brought forward to assist and co-operate with the special guardian in carrying out the plans arranged beforehand by which the title unincumbered by the infant's interest, could be transferred to the father. It is true, the father deposited with the city chamberlain the money value of the infant's interest, and while, therefore, no attempt to overreach or wrong the infant was done or intended, it would never do to hold that such a proceeding was merely irregular or voidable, but it should be held to be absolutely void."

See, also *Moscowitz v. Homberger*, 43 N. Y. Supp. 1130; *Rome Land Co. v. Eastman*, 80 Ga. 683 (6 S. E. 586).

In *Rome Land Co. v. Eastman, supra,* it was held that a sale under such circumstances was contrary to public policy.

"As a general rule, a party occupying a relation of trust or confidence to another is, in equity, bound to abstain from doing everything which can place him in a position inconsistent with the duty or trust such relation imposes on him, or which has a tendency to interfere with the discharge of such duty. Upon this principle, no one placed in a situation of trust or confidence in reference to the subject of a sale can be the purchaser, on his own account, of the property sold. If such a one purchases the property, it is in the option of the person interested in the property, and to whom the relation of trust or confidence was sustained, to set aside the sale, within a reasonable time, however innocent the purchaser may be. 1 Story, Eq. Jur. §§ 307-323, and cases cited."

In *Hindman v. O'Connor*, 54 Ark. 627 (13 L. R. A. 490, 16 S. W. 1052), the facts were as follows: At a judicial sale of minors' property their step-grandmother bought in the property. At the death of the children's mother, and at her request, the step-grandmother took charge of them, and they thereafter made their home with her. The management of the sale of the minors' property was by law imposed upon a stranger, the curator of the estate( which in Arkansas is the same as our guardian), and the purchaser acted fairly and in good faith. Yet the court, when the children became of age, at their request, set the sale aside. In rendering its opinion, the court said:

"The doctrine as to purchases by trustees, guardians, administrators, and persons having a confidential character arises from the relation between the parties, and not from the circumstance that they have power to control the sale. The right to set aside the sale does not depend on its fairness or unfairness. To set aside the purchase, it is not necessary to show that it was actually fraudulent or advantageous. If the trustee or other person having a confidential character, can buy in an honest case, he may in a case having that appearance, but which may be gross-

ly otherwise; and yet the power of the court, because of the infirmity of human testimony, would not be equal to detect the deception. It is to guard against this uncertainty, and the hazard of abuse, and to remove the trustee and other persons having confidential relations from temptation, that the rule does and will permit the *cestui que trust*. or other person to come at his option, and, without showing actual injury or fraud, have the sale set aside. *Davoue v. Fanning,* 2 Johns. Ch. 252, 1 L. ed. 365; *Torrey v. Bank of Orleans,* 9 Paige, 663, 4 L. ed. 859; *Ex parte James,* 8 Ves. Jr. 345; *Brochett v. Richardson,* 61 Mass. 766; *Van Epps v. Van Epps,* 9 Paige, 237, 4 L. ed. 682; *Campbell v. Walker,* 5 Ves. Jr. 678, 13 Ves. Jr. 601; *Callis v. Ridout,* 7 Gill & J. 1; *Ex parte Lacey,* 6 Ves. Jr. 625; *Ex parte Bennett,* 10 Ves. Jr. 381; *Campbell v. Pennsylvania L. Ins. Co.,* 2 Whart. 62; *Michoud v. Girod,* 45 U. S., 4 How. 557, 11 L. ed. 1100, and cases before cited; *McGaughey v. Brown,* 46 Ark. 25."

We think that the case at bar presents stronger reasons for setting aside the sales than does *Hindman v. O'Connor, supra.* The court in that case stated the rule of law correctly, and it is unnecessary for us to enlarge upon the same.

We have already decided that the property in controversy is presumed to have been the community property of F. M. Tull and wife at the time of her death. If this presumption did not control, we think that the respondent is estopped from disputing the title of these children. When Lucy A. Tull died, respondent refused to go on with the loan until the interest of the children was transferred to the father. F. M. Tull and the respondent dealt with this property as a whole on the basis that the children had one-half interest therein. F. M. Tull and Lucy A. Tull had agreed as to the status of the property before her death, and this status was recognized by the respondent; but the presumption that it was community property not having been overthrown, it is not necessary

to further comment on the effect and character of this estoppel.

The judgment and decree of the lower court is reversed, with costs to appellants. This cause is remanded to the court below, with instructions to enter a judgment and decree herein adjudging and decreeing that Dora May Dormitzer, William L. Tull, and Ernest B Tull, the appellants herein, are entitled to an unincumbered, undivided one-half of the real estate described in the pleadings in this action, and that the guardian deeds described in said pleadings and orders of the probate court of Spokane county, directing the sale of said half interest, or in any way affecting the same, and the said guardian deeds conveying the same to F. M. Tull by P. D. Tull as guardian of said appellants, as set out in the pleadings, be declared fraudulent, null and void; and also decreeing that the plaintiffs in the action below recover their costs.

DUNBAR, C. J., and REAVIS, J., concur.

ANDERS and FULLERTON, JJ., dissent.